UNITED STATES of America, Appellee,

v.

Anderson Dewell PARSONS, Appellant.

No. 81-1016.

United States Court of Appeals,
Eighth Circuit.

Submitted March 6, 1981.

Decided April 21, 1981.

Boswell & Smith, P. A. by Floyd Clardy, Bryant, Ark., for appellant.

George W. Proctor, U. S. Atty., Fletcher Jackson, Asst. U. S. Atty., Little Rock, Ark., for appellee.

Before HEANEY, HENLEY and AR-NOLD, Circuit Judges.

ARNOLD, Circuit Judge.

Anderson Dewell Parsons appeals from his conviction in the district court[1] on five counts of misapplication of credit-union funds in violation of 18 U.S.C. § 657 and two counts of making false loans with the intent to defraud the credit union in violation of 18 U.S.C. § 1006.[2] He was sentenced to eighteen months imprisonment on three of the misapplication counts, to be served concurrently, and three years probation on the remaining misapplication counts and false-loan counts, to be served consecutively to the term of imprisonment imposed on the first three counts.

For reversal of his conviction, Parsons argues that the district court erred in (1) overruling his motion to suppress a bankruptcy petition he filed and later voluntarily dismissed, (2) interrupting the direct examination of Parsons and requiring that his testimony be given in such a way as to conform to the prosecution's theory of guilt, and (3) failing to instruct the jury that it must find that the named debtors lacked the ability or intent to repay their respective loans. Parsons also contends that there was insufficient evidence to sustain a conviction.

Parsons, who was assistant superintendent in charge of instruction for the Benton Public School System for seventeen years until June of 1980, assumed the nonsalaried[3] position of treasurer of the Saline County Educational Federal Credit Union in 1976. As treasurer, he maintained the loan records and signed the checks for those who received loans from the Credit Union.

Count I concerns a personal check in the amount of $1,339.16 received by Parsons and deposited in his personal checking account. The drawer of the check was Cindy Fikes, a teacher in the Benton School System and a member of the Credit Union. The name of the payee was left blank. Ms. Fikes testified that she gave Parsons the check to pay her loan at the Credit Union. Parsons asserts that the check was, instead, a repayment of personal loans he had made to her. The transaction occurred on or about February 5, 1979, several months after Ms. Fikes had taken out three loans from the Credit Union in her name at the request of Parsons. One of those loans, all of which were made in April, 1978, was for $1,500.00, and provides the basis for Count II of the indictment. Parsons is charged in that count with misapplication of the $1,500.00 check, drawn on Credit Union funds. Ms. Fikes testified that she signed the loan applications at Parsons's request and gave the checks, other than one for $200.00, to Parsons. Bank records indicate that the $1,500.00 check was deposited into the account of Ed Elmore, a business associate and close friend of Parsons, who then wrote a check to Parsons for $1,200.00, apparently retaining $300.00 for himself.

---

1. The Honorable Elsijane Trimble Roy, United States District Judge for the Eastern and Western Districts of Arkansas.

2. A third count of violating 18 U.S.C. § 1006 (count VII) was dismissed on motion of the government.

3. Parsons later began receiving fifty dollars each month from the Credit Union to cover expenses incurred while performing the duties of treasurer.

Count III deals with a loan for $3,000.00 made to Parsons's son, Lamont, in April, 1977. Although only seventeen or eighteen years of age at the time, Lamont Parsons signed the application for the loan, stating that the money was to be used for the purchase of an automobile. The check, however, was turned over to Ed Elmore after being endorsed by Lamont. Elmore, who was not qualified to borrow from the Credit Union, deposited the $3,000.00 into his own bank account. Neither Credit Union committee members nor federal credit union examiners were aware of the true nature of the transaction until some time after the loan had been made.

A loan transaction involving Cindy Hogue, a teacher in the Benton School System and a member of the Credit Union, is the basis of Count IV. Ms. Hogue approached Parsons and inquired about entering into a financial arrangement similar to that set up with Cindy Fikes. He obliged by giving her $100.00 for taking out a loan, which he said was intended for a "third party," and informed her that she would not be responsible for the loan's repayment. Ms. Hogue endorsed a check for $3,334.09 received from the Credit Union and then returned it to Parsons. Parsons apparently gave the check to Ed Elmore, who made a second endorsement of the check, depositing it into his account. He next wrote a personal check to Parsons in the same amount as the Hogue check. This arrangement and "laundering" process were duplicated in an earlier, November, 1976, loan transaction with Anita Turbyfill, another Benton teacher. The amount involved there was slightly greater, $3,950.68, and Ed Elmore returned the money to Parsons through a total of three checks instead of one. Parsons is charged with misapplication of this amount in Count V.

The final two counts on which Parsons was convicted charge a conflict of interest in two loan transactions that occurred in April, 1978, and December, 1978, respective-ly. In the first, Annette Ford, an employee of the Benton Public Schools and a credit-union member, took out a loan for $3,000.00 at the request of Parsons. She received $300.00 and gave the remaining $2,700.00 to Parsons. In the second transaction, a $500.00 loan was taken out in the name of Michele Brown, daughter of Anita Turbyfill. Ms. Turbyfill signed her daughter's name on the loan application, endorsed the check, and returned it to Parsons. Although Ms. Turbyfill testified that she was under the impression that the money was going to an elderly person, it actually was received by Valene Parsons, Parsons's former wife, who eventually repaid the loan.

I. The Bankruptcy Petition

Parsons argues that a bankruptcy petition filed by him on February 20, 1980, should not have been admitted into evidence.[4] The petition listed as creditors with contingent claims the names of Anita Turbyfill, Cindy Hogue, Cindy Fikes, Lamont Parsons, Annette Ford, and Denise Parsons.[5] All of these individuals, except Denise Parsons, applied for and received loans from which either Parsons or Ed Elmore received the proceeds. Parsons contends that the contingent nature of the debts prevents the bankruptcy petition from being treated as an admission. He further asserts that the statements on the petition were those of his attorney and therefore inadmissible legal opinions and hearsay. Admitting the petition into evidence thus would violate the confrontation clause of the Sixth Amendment, he argues. We cannot agree.

Fed.R.Evid. 801(d)(2) provides:

A statement is not hearsay if—

\* \* \* \* \* \*

The statement is offered against a party and is (A) his own statement, in either his individual or a representative capacity or (B) a statement of which he has manifested his adoption or belief in its truth, or (C) a statement by a person authorized by

4. On motion of Parsons, the bankruptcy court dismissed the petition on April 15, 1980.

5. The claims were in the amounts of $5,446.80, $3,727.18, $5,100.00, $6,000.00, $2,873.10, and $6,000.00, respectively.

him to make a statement concerning the subject, or (D) a statement by his agent or servant concerning a matter within the scope of his agency or employment made during the existence of the relationship, or (E) a statement by a coconspirator of a party during the course and in furtherance of the conspiracy.

■ It is clear that the bankruptcy petition is admissible under various subsections of the above rule even if we take as true Parsons's allegation that statements in the document (signed by him) were only those of his attorney. *See United States v. Johnson*, 529 F.2d 581, 584 (8th Cir. 1976), *cert. denied*, 426 U.S. 909, 96 S.Ct. 2233, 48 L.Ed.2d 835 (1976); *Rule v. International Association of Bridge, Structural and Ornamental Ironworkers, Local Union No. 396*, 568 F.2d 558, 569 n.17 (8th Cir. 1977); *cf. United States v. Dolleris*, 408 F.2d 918 (6th Cir. 1969), *cert. denied*, 395 U.S. 943, 89 S.Ct. 2014, 23 L.Ed.2d 461 (1969). Several courts have permitted the introduction of bankruptcy schedules into evidence in criminal proceedings. See, *e. g., Ensign v. Pennsylvania*, 227 U.S. 592, 33 S.Ct. 321, 57 L.Ed. 658 (1913); *Czarlinsky v. United States*, 54 F.2d 889 (10th Cir. 1931).

The bankruptcy petition is neither lacking in probative value nor unduly prejudicial. The document shows Parsons considered that he might be responsible for the loans made to the listed creditors and corroborates the testimony of several witnesses. That the debts were listed only as contingent goes to the weight of the evidence, not its admissibility. The district court did not err in denying Parsons's motion to suppress the bankruptcy petition.

## II. "Interruption" of Parsons's Direct Examination

Parsons's next contention on appeal is that the district court improperly interrupted the direct examination of the defendant and required that his testimony be given in such a way as to conform to the prosecution's theory of guilt. This contention is without merit.

The transcript indicates that, during the course of direct examination, Parsons's attorney was attempting to show that the check from Cindy Fikes, in the amount of $1,339.16 and dated February 5, 1979, represented a payment on a personal loan Parsons had made to her. Ms. Fikes had testified earlier that the check was actually a payment on money she had borrowed on her own initiative from the Credit Union. The ledger card of the Credit Union reveals that Cindy Fikes owed the institution $1,343.66 at the time she received loans made at the request of Parsons on April 3, 1978.[6] Ms. Fikes borrowed an additional $600.00 in her own right from the Credit Union in November, 1979. Parsons's attorney sought to combine these two loan amounts, and the prosecution objected, precipitating the following exchange:

[Defense]: You testified that she already received $1,586.66 from the Credit Union. And now she's gotten another $600. What does that total to?

[Parsons]: Well, it totals to $2,180.66, if my adding is correct.

[Defense]: Okay. Now, that's all part of this same loan. The money—the first part of the money in April went to Ed Elmore and, when it was increased, the rest of the money went to Cindy Fikes. Is that right?

[Parsons]: Yes. Cindy got part of the second one and then she got all of the last.

[Defense]: Do you know if she repaid that $2,000, whatever it is that you just added up?

[Parsons]: No, I do not.

[Prosecution]: Your Honor, we went through that the other day. She paid the $1,300 before she borrowed the $600.

[Defense]: Now, that's his version of it. That's not what the record shows.

[The Court]: Well, that's why I said it's very important to give the dates. The ledger should show when she—the testimony of the witness was that she repaid

---

**6.** Cindy Fikes received a $200 loan in her own right on April 3, 1978, increasing to $1,543.66, plus interest, her personal debt to the Credit Union.

before she borrowed the other $600. But that will be for the jury to weigh the credibility of the witnesses. You may proceed, but let's be specific about dates and how much it was, and let's just don't add it up if there have been credits and payments made on this account.

[Defense]: Well, we're looking at the ledger, Government's Exhibit No. 9. What does it show?

[Prosecution]: What I would ask you to look at is the check, the $1,300 check, the date on it.

[Defense]: He's—

[The Court]: All right. I don't want this jury to be misled. Let's let them see the dates. That's what I said. It's very confusing. All the dates should be called to their attention as these payments are made and they should not be misled. If a payment has been made, then the check should be looked at and the date given as it would go along with the ledger sheet. We're trying to get at the truth.

[Defense]: Let me show them the ledger sheet.

[The Court]: All right, you may do so.

[Prosecution]: Your Honor, if he does that, I want him to put the check with it.

[Defense]: Your Honor, I think this is cross-examination.

[The Court]: This is the Court directing you to show them the two exhibits at the same time.

[Defense]: What check is he wanting?

[Prosecution]: You know which check I want. It's the thirteen hundred dollar check.

[The Court]: All right. No remarks. Let's show the check where this witness testified she paid $1,300. You may help the clerk identify it.

All right, Mr. Jackson [the Assistant United States Attorney], you may assist. You are familiar with this exhibit and may help the clerk find it.

■ The district court did not abuse its discretion by attempting to clarify the events surrounding the loans received by Cindy Fikes and the various related transactions that occurred. See *Scruggs v. United States*, 450 F.2d 359 (8th Cir. 1971), *cert. denied*, 405 U.S. 1071, 92 S.Ct. 1521, 31 L.Ed.2d 804 (1972). The documents were merely presented to the jury for its consideration in weighing the evidence and the credibility of the witnesses. The court was careful to say that it was for the jury to decide whom to believe.

### III.  Jury Instructions

Parsons argues that the district court erred by failing to instruct the jury on the issue of whether the named debtors lacked the ability or intent to repay their respective loans.[7] He contends that the persons whose names appear on the loan applications had the ability and understood that they were obligated to pay the loans if he himself was unable to make the necessary payments. Parsons cites *United States v. Gallagher*, 576 F.2d 1028 (3d Cir. 1978), as support for his position that this question should have been submitted to the jury.

In *Gallagher*, the convictions of several defendants charged with conspiracy in the misapplication of bank funds were reversed. It was held that the district court erred by failing to charge the jury that it must find that the bank official knew that those named as debtors lacked the ability or intent to repay the loans. 576 F.2d at 1046. The official, a bank branch manager, made out loans in the names of persons who were either asked to serve as nominal or sham

---

7. Defendant's requested Instruction No. 1 stated:

"In order to find that the defendant intended to injure or defraud the Saline County Federal Credit Union, you must find beyond reasonable doubt that the named debtors, the persons whose names appear on the various loans, lacked the ability or intent to repay these respective loans. In making this deter-

mination, you may take into account such factors as whether the named debtors were credit worthy and whether they intended to repay the loan.

Unless the government proves beyond a reasonable doubt that the named debtors lacked the ability or intent to repay the respective loans, you must acquit the defendant."

borrowers and agreed to do so, or in whose names loans were granted without their express approval or knowledge. The loans were ultimately received by another defendant, the president of a company that needed money.

The *Gallagher* decision is consistent with other bank cases in which the proceeds from a loan are given to a third party. See, *e. g.,* *United States v. Gens,* 493 F.2d 216, 222 (1st Cir. 1974) ("[W]here the named debtor is both financially capable and fully understands that it is his responsibility to repay, a loan to him cannot—absent other circumstances—properly be characterized as sham or dummy, even if bank officials know he will turn over the proceeds to a third party.") As noted, however, in our recent opinion in *United States v. Steffen,* 641 F.2d 591 (8th Cir. 1981):

> [a] different situation is presented where, as here, a bank officer makes loans to putative borrowers, with the intent that the proceeds be used for his own benefit. The officer conceals his interest from the bank in order to circumvent the statutory limitations on insider loans. In such cases, courts have held that the financial condition of the putative borrower is irrelevant .... Willful misapplication is established by the fact "that the loan was undertaken with intent to defraud the bank or to deceive its officers or examiners." *United States v. Krepps,* 605 F.2d 101, 106 (3d Cir. 1979).

At 597.

In all but two loan transactions, Parsons received the proceeds. The money may have traveled through several intermediaries, but he was the ultimate beneficiary. The reason for this subterfuge may be inferred from the fact that the Credit Union placed a limit of $4,500 on the amount a member could borrow.[8] Parsons reached

that limit prior to the time some of the loans were arranged. As in *United States v. Steffen, supra,* these loan transactions were structured in a way to deceive Credit Union committee members and examiners. With the exception of Counts III and VIII, the district court properly rejected Parsons's jury instructions on the named debtors' intent and ability to pay.

In the transactions underlying Counts III and VIII, the proceeds from the loans were received by individuals other than Parsons. Ed Elmore was the recipient of the loan taken out by Lamont Parsons, and Parsons's former wife, Valene, received the $500 from the loan made out to Michele Brown which was the substance of Count VIII. On the basis of these facts, we vacate the convictions on these two counts of the indictment.[9]

Parsons makes the final argument that there was insufficient evidence to support his convictions under §§ 657 and 1006 of Title 18 of the United States Code.[10] For reasons already given, we find this argument without merit. Accordingly, we affirm the convictions on Counts I, II, IV, V, and VI, and vacate those on Counts III and VIII. Since the penalty imposed on Count III runs concurrently with that on Counts I, II, and IV, and the penalty imposed on Count VIII runs concurrently with that on Count VI, the sentences remain intact.

Affirmed in part, vacated in part.

---

8. The limit was later increased to $5,400.00.

9. We do not fault the district court for refusing the tendered instruction. The instruction was not limited to Counts III and VIII, so as requested it did not correctly state the law. In addition, *United States v. Steffen, supra,* was decided after the trial, so the district court did not have the benefit of our opinion in that case

to assist it in evaluating defendant's request. We believe, however, that it would be in the interests of justice to vacate the convictions on Counts III and VIII, as to which counts the requested instruction would have been proper.

10. Parsons excludes Count I from this assertion.