**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Darrick MORGAN, aka D. Morgan,
Defendant–Appellant.**

**United States of America,
Plaintiff–Appellee,**

v.

**Tyra Goodman, aka Tyra Johnson, aka
T. Eileen Johnson, Defendant–
Appellant.**

Nos. 02–50603, 02–50617.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 7, 2004.

Filed July 23, 2004.

20. *Lopez–Mendoza,* 468 U.S. at 1047, 104 S.Ct. 3479.

Alissa Sawano Peterson, Irvine, CA, and Myra D. Mossman, Santa Barbara, CA, for the defendants-appellants.

Michael J. Raphael, Assistant United States Attorney, Criminal Appeals Section, Los Angeles, CA, for the plaintiff-appellee.

Before: D.W. NELSON, GIBSON,* and GRABER, Circuit Judges.

GRABER, Circuit Judge:

Defendant Tyra Goodman challenges her convictions for bank fraud and making false statements to a federally insured financial institution, stemming from the unauthorized acquisition and use of several business lines of credit. Goodman argues

---

* The Honorable John R. Gibson, Senior Circuit Judge, United States Court of Appeals for the Eighth Circuit, sitting by designation.

that the trial court erred in allowing the government to introduce a bankruptcy petition into evidence and in questioning her extensively from the bench. For the reasons stated below, we affirm Goodman's convictions. Co-defendant Darrick Morgan does not challenge his convictions but challenges the sentence and restitution order, arguing that the court erroneously included interest and finance charges in its calculation of the total amount of loss for both sentencing and restitution. Goodman joins in Morgan's challenge to the sentence, but does not challenge the district court's restitution order in her case. We hold that, in the light of a 2001 amendment to the United States Sentencing Guidelines ("U.S.S.G."), the district court erred in including interest and finance charges in its calculation of actual loss for sentencing purposes. Therefore, Defendants' sentences must be vacated and the case remanded for resentencing. The sentencing court's restitution orders, however, were proper and are affirmed.

## BACKGROUND

### A. Factual Background

In 1995, Goodman, along with members of her family, purchased a travel agency named Palos Verdes Travel. Almost immediately, the travel agency began to experience financial difficulties. Later that year, Morgan purchased a "partnership" in the travel agency. While Goodman concentrated on the travel agency business, Morgan tried to attract investors for a movie about the life of singer Marvin Gaye and for various real estate projects. In 1996, with their financial difficulties mounting, Goodman and Morgan moved the travel agency from Palos Verdes to El Segundo and changed the travel agency's name to "Elite Travel." Elite Travel closed its doors in 1997.

From January 1996 through at least June 1997, Morgan and Goodman executed a scheme to obtain business lines of credit from two banks by using social security numbers and other personal information that they misappropriated from four unsuspecting individuals. Using that information, Defendants completed written or telephonic applications for business lines of credit in the name of a fictitious company allegedly owned by one of the four individuals and then forged that individual's name on an "Acceptance Certificate." When a bank requested additional documentation, Defendants sent fictitious documents such as tax forms, partnership agreements, and articles of incorporation. The business lines of credit were, in essence, unsecured loans for which the falsely identified business owner was personally liable. On the loan applications, Defendants listed themselves as authorized users of the accounts and asked that credit cards be issued in their names.

Once the cards arrived, Defendants used the lines of credit for their personal benefit, frequently charging expenses well beyond the limit of a particular line of credit. In total, six lines of credit were obtained in the names of four fictitious companies. The losses associated with those lines of credit totaled $533,529.83. Of that total, interest accounts for $32,729.62 and finance charges account for $8,414.01 (for a total of $41,143.63), while actual funds disbursed account for $492,386.20.

### B. Procedural History.

Following an investigation, a grand jury charged Defendants with bank fraud and making false statements to a federally insured financial institution, in violation of 18 U.S.C. §§ 1344(1), 1014, and 2(b). Defendants were tried jointly. At the jury trial, the government introduced testimony from all four individuals whose names and social

security numbers were used to obtain the lines of credit. The witnesses denied giving Defendants permission to forge their signatures on loan applications, to obtain the business lines of credit, or to use those lines of credit for personal expenses. The forged documents that Defendants used to obtain the lines of credit were also introduced into evidence. Further, Goodman testified that she had used the lines of credit to make various purchases and cash withdrawals for personal expenses.

On cross-examination, the government asked Goodman whether she owed more than $100,000 to creditors in 1996. When Goodman denied owing "a lot of money" to creditors, the government attempted to refresh her recollection with a 1996 bankruptcy petition that she had filed, according to which creditors held secured claims of $129,000 against Goodman. Goodman testified that the information on the bankruptcy petition was incorrect. The government then introduced the bankruptcy petition into evidence.[1] Goodman explained that the bankruptcy petition had been filed, but later withdrawn.

After the government concluded its cross-examination of Goodman, the court questioned Goodman at some length about the involvement of Sherrie Bowler with the fictitious company "Elite Investments." Bowler co-signed for a loan that Defendants made to Bowler's friend. The $12,-000 "loan" was actually a cash transfer from a business line of credit secured by Bowler's personal assets. The court asked Goodman whether Bowler understood the nature of her involvement with Elite Investments, whether Bowler expected to benefit from that arrangement, and how Goodman spent the money withdrawn from the Elite Investments accounts. Goodman's lawyer did not object to that questioning.

The jury found both Defendants guilty of all counts, and the court sentenced them in November 2002. The court concluded that Defendants' conduct resulted in $533,529.83 in actual losses to the victim banks. Under the 1995 version of U.S.S.G. § 2F1.1, that amount of loss results in a 10–level increase in the base offense level.[2] Relying on a total offense level of 18, the court sentenced each Defendant to 27 months' imprisonment and 5 years' supervised release. The court also ordered restitution in the amount of $533,529.83, holding Defendants jointly and severally liable for that amount. These timely appeals followed.

## STANDARDS OF REVIEW

■ We review for abuse of discretion a district court's decision to admit impeachment evidence. *United States v. Geston,* 299 F.3d 1130, 1137 (9th Cir.2002).

■ With respect to the judge's questions of a witness, "[a] federal judge has broad discretion in supervising trials, and

---

1. The government did not include the petition on its pretrial list of exhibits. The government added the document to the list of exhibits at some point during the trial. Before the government began its cross-examination of Goodman, Goodman's lawyer objected to the late inclusion of the petition, saying "This is the first I've seen of it." The court overruled the objection, stating that, because the government was using the petition only for cross-examination, Goodman's lawyer was not entitled to have it beforehand.

2. A 2001 amendment to the Sentencing Guidelines substantially increased the penalties for bank fraud. Therefore, the court sentenced Defendants under the version of the Sentencing Guidelines in effect at the time that they committed the offense conduct, to avoid a potential violation of the ex post facto clause of the United States Constitution. *See* U.S.S.G. § 1B1.11(b)(1).

his or her behavior during trial justifies reversal only if it abuses that discretion." *United States v. Laurins*, 857 F.2d 529, 537 (9th Cir.1988). When a defendant fails to object during trial, we review for plain error an allegation of judicial misconduct. *United States v. Springer*, 51 F.3d 861, 864 n. 1 (9th Cir.1995).

■ We review de novo a district court's interpretation and application of the Sentencing Guidelines. *United States v. Garcia*, 323 F.3d 1161, 1164 (9th Cir.), *cert. denied*, —— U.S. ——, 124 S.Ct. 842, 157 L.Ed.2d 720 (2003). Provided that a restitution order is within the bounds of the statutory framework, we review that order for abuse of discretion. *United States v. Riley*, 335 F.3d 919, 931 (9th Cir.2003).

## DISCUSSION

A. *Goodman's Challenges to Her Convictions*

1. *The Admission of the Bankruptcy Petition into Evidence*

■ Goodman first argues that her conviction must be reversed because the court improperly allowed the government to introduce evidence of "other acts" in the form of her 1996 bankruptcy petition. *See* Fed.R.Evid. 404(b).[3] However, the government did not introduce the petition as evidence of an *act* at all. Rather, the

challenged evidence came in as a *statement* used to rebut Goodman's denial of her "personal credit problems" in 1996:

> Q. [by the government] And whatever the causes of the problems may have been, the problem essentially was that you owed a lot of money personally at that time?
>
> A. Not a lot of money, no.
>
> Q. Isn't it true, Miss Goodman, that on May 24th, 1996, you owed well over $100,000 to creditors?
>
> A. Not to my knowledge.

Once Goodman denied owing over $100,000 to creditors,[4] the bankruptcy petition—containing a prior, sworn, contradictory statement made by a party witness—became admissible under three evidentiary rules. *See* Fed.R.Evid. 613 (prior statement of a witness); Fed.R.Evid. 801(d)(1)(A) (prior inconsistent statement given under oath subject to a penalty of perjury); Fed.R.Evid. 801(d)(2) (admission by a party opponent); *see also United States v. Parsons*, 646 F.2d 1275, 1277–78 (8th Cir.1981) (admitting bankruptcy petition as an admission by a party opponent under Fed.R.Evid. 801(d)(2)).

Goodman relies on *United States v. Bensimon*, 172 F.3d 1121 (9th Cir.1999). We find the analogy unpersuasive. In that case, we reaffirmed our rejection of " '[p]overty as proof of motive' " and stated that "a petition for bankruptcy is not in

---

3. Federal Rule of Evidence 404(b) provides:

 Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause

 shown, of the general nature of any such evidence it intends to introduce at trial.

4. Goodman apparently was justified in denying specifically that she owed more than $100,000 to creditors. She withdrew her bankruptcy petition after it was filed because it contained incorrect information. Goodman estimated that she owed about $50,000 to creditors at the time. In view of her admission that she owed around $50,000 to creditors, however, her denial of owing "a lot of money" to creditors is of dubious accuracy.

and of itself evidence of a specific and immediate financial need such that it would be relevant to showing [a defendant's] motive." 172 F.3d at 1129 (quoting *United States v. Mitchell*, 172 F.3d 1104, 1108–09 (9th Cir.1999)). At trial in *Bensimon*, the government also argued that the bankruptcy petition showed that Bensimon "was trying to start a new after bankruptcy by assuming the identity of [another]." *Id.* We held that the district court, in admitting the bankruptcy petition for that purpose, had "overlooked the prejudice that may occur when the prosecution in a criminal case is allowed to introduce evidence of a prior illegal, fraudulent act by the defendant." *Id.*

Neither *Bensimon's* prohibition against evidence of "poverty as proof of motive" nor its concern about the use of bankruptcy petitions as evidence of a "prior illegal, fraudulent act by the defendant" is implicated here. The government did not argue that bankruptcy motivated Goodman's illegal conduct. Nor did the government argue that there was anything fraudulent or illegal in Goodman's initial filing, or later withdrawal, of the bankruptcy petition. Instead, the petition was introduced for the narrow purpose of showing a prior inconsistent statement.

In these circumstances, the district court did not abuse its discretion by admitting the bankruptcy petition.

### 2. *The District Court's Participation in the Examination of Goodman*

■ In *United States v. Mostella*, 802 F.2d 358, 361 (9th Cir.1986), we recognized that a trial judge's discretion to participate in the examination of a witness, although broad, is not unlimited:

It is entirely proper for [a judge] to participate in the examination of witnesses for the purpose of clarifying the evidence, confining counsel to evidentiary rulings, controlling the orderly presentation of the evidence, and preventing undue repetition of testimony.

A trial judge's participation may, however, overstep the bounds of propriety and deprive the parties of a fair trial. This court will order a new trial, however, only if the record discloses actual bias on the part of the trial judge or leaves the reviewing court with an abiding impression that the judge's remarks and questioning of witnesses projected to the jury an appearance of advocacy or partiality.

(Citations and internal quotation marks omitted.)

■ Here, the trial judge's examination of Goodman went beyond clarifying the evidence. Although the trial judge's participation in the examination of Goodman was, in our view, inappropriately extensive and suggestive of the court's own conclusion about Goodman's credibility, it does not warrant reversal for plain error. *Mostella* held that the judge's participation in the examination of a witness did not warrant reversal "particularly in light of the judge's specific instruction that the jury disregard" testimony elicited by the judge's examination of a witness. *Id.* at 362. Similarly, in *United States v. Sanchez–Lopez*, 879 F.2d 541, 553 (9th Cir. 1989), when reviewing a trial judge's remarks for plain error, we stated that "any possible adverse impact was obviated by the [curative] instruction given by the court." Even in cases where a judge's participation in a trial is "extreme," that participation generally does not warrant reversal if a later curative instruction is given. *United States v. Parker*, 241 F.3d 1114, 1119 (9th Cir.2001).[5]

---

5. We do not suggest that a curative instruction *always* will suffice to obviate the adverse

Here, before either party presented any evidence, the district court read to the jury a detailed instruction regarding questions and comments from the bench:

> During the course of the trial I may occasionally ask questions of a witness in order to bring out facts which may not be fully covered by the testimony. You are not to consider my questioning of a witness, even if it may become lengthy, as an indication of what I feel about the case in general or the testimony of that witness in particular.

After closing arguments, the district court again stressed that "no question of mine, no admonition of mine to any counsel, no ruling that I have made on any evidence is to suggest in any way what verdict I think you should find." In the light of the emphasis that cases like *Mostella* and *Sanchez–Lopez* place on curative instructions, the court's instructions to the jury—both before and after the questioning—lead us to conclude that the judge's participation did not prejudice Goodman.

Our conclusion is reinforced by the context in which the court's questions occurred. Before the judge questioned Goodman about Bowler's understanding of her involvement with Elite Investments, Bowler herself testified that she had no idea that Defendants had obtained or used a business line of credit in her name. Every other individual victim of Defendants' fraudulent scheme testified similarly that he or she was unaware of involvement with the fictitious companies, and each denied authorizing Defendants to forge documents, secure credit, or make charges against those lines of credit.

In view of that testimony, as well as the court's curative instructions, it is highly unlikely that, here, "a substantial right of a defendant [was] affected." *Sanchez–Lopez*, 879 F.2d at 551. Thus, we hold that the trial judge's participation in the examination of Goodman did not constitute plain error requiring reversal.

B. *Retroactive Application of the 2001 Amendment to the Sentencing Guidelines*

Because Amendment 617 to the Sentencing Guidelines, U.S.S.G. Manual supp. app. C (2001), substantially increased the penalties for fraud and other financial crimes, the district court sentenced Defendants under the version of the Sentencing Guidelines in effect at the time the offense was committed, rather than the version in effect on the date of sentencing. *See* U.S.S.G. § 1B1.11(b)(1) ("If the court determines that use of the Guidelines Manual in effect on the date that the defendant is sentenced would violate the *ex post facto* clause of the United States Constitution, the court shall use the Guidelines Manual in effect on the date that the offense of conviction was committed."); *United States v. Johns*, 5 F.3d 1267, 1269 (9th Cir.1993) (so holding). Using the 1995 version of U.S.S.G. § 2F1.1, the court determined that the total amount of loss attributable to Defendants' conduct was $533,529.83, leading to a 10–level increase to the adjusted offense level. U.S.S.G. § 2F1.1(b)(1)(K) (1995). Both Defendants objected to the inclusion of $41,143.63 in interest and finance charges in the total amount of loss to victims. Exclusion of interest and finance charges would bring

effect of a judge's improper questioning. For example, in *United States v. Pena–Garcia*, 505 F.2d 964, 965 (9th Cir.1974), the trial judge "interrupted and continued to interrogate, cross-examine, threaten and intimidate the witness and to threaten defense counsel with contempt." In those circumstances, reversal could be warranted even if the judge gave a later curative instruction. However, the judge's questioning here was far less pervasive and far less prejudicial.

the amount of loss below $500,000, leading to a one-level reduction in Defendants' total offense level. U.S.S.G. § 2F1.1(b)(1)(J) (1995).

It is unclear whether, in 1995, the Guidelines intended for contractual interest and finance charges to be included in the total amount of loss. The Guidelines defined loss as "the value of the money, property, or services unlawfully taken; *it does not, for example, include interest the victim could have earned on such funds had the offense not occurred.*" U.S.S.G. § 2F1.1, cmt. n. 7 (1995) (emphasis added). When applying that provision, some circuits distinguished between contractual interest and "opportunity cost" interest (that is, interest the lender could have earned if it had invested the borrowed amount elsewhere). Those circuits concluded that the former, but not the latter, could be included in the loss calculation. *United States v. Goodchild,* 25 F.3d 55, 65 (1st Cir.1994); *United States v. Lowder,* 5 F.3d 467, 471 (10th Cir.1993). Other circuits rejected the distinction between contractual interest and opportunity cost interest and concluded that all interest owed on loans was excluded from the Guidelines' definition of loss. *United States v. Hoyle,* 33 F.3d 415, 419 (4th Cir.1994); *United States v. Guthrie,* 144 F.3d 1006, 1011 (6th Cir.1998). Both interpretations were reasonable, and the ambiguity of application note 7 was acknowledged. *Goodchild,* 25 F.3d at 65–66.

The Ninth Circuit has not yet confronted the issue. In *United States v. Davoudi,* 172 F.3d 1130, 1136 (9th Cir.1999), we stated in dictum that a district court "may choose to include unpaid interest still due on the loan in the calculation of the victim's actual loss." However, our actual holding in that case was limited to concluding that a district court is not required to deduct interest payments from the total amount of loss. *Id.* at 1135–36. Thus, *Davoudi* left open the larger issue of the treatment of contractual interest generally under § 2F1.1.

■ In 2001, the Sentencing Commission resolved the circuit split in an amendment to the Sentencing Guidelines that added application note 2(D) to § 2B1.1. Application note 2(D)(i) (since renumbered 3(D)(i)) states that "[l]oss shall not include . . . [i]nterest of any kind, finance charges, late fees, penalties, amounts based on an agreed-upon return or rate of return, or other similar costs." Defendants point to that application note as conclusive proof that the district court's sentencing decision is erroneous. However, we may consider the 2001 amendment when interpreting the 1995 version of the Sentencing Guidelines only if that amendment is a clarification of existing law rather than a substantive change in the law. *See United States v. Sanders,* 67 F.3d 855, 856 (9th Cir.1995) ("The Ninth Circuit has consistently stated that when an amendment is a clarification, rather than an alteration, of existing law, then it should be used in interpreting the provision in question retroactively."); *see also* U.S.S.G. § 1B1.11(b)(2) (providing that "if a court applies an earlier edition of the Guidelines Manual, the court shall consider subsequent amendments, to the extent that such amendments are clarifying rather than substantive changes"). The parties, therefore, focus their dispute on the issue whether the 2001 amendment is a clarifying or a substantive amendment.

■ As our cases in this area demonstrate, "[i]t may not always be easy to determine whether an amendment clarifies or changes a guideline." *Johns,* 5 F.3d at 1269; *see also United States v. Spinello,* 265 F.3d 150, 160 (3d Cir.2001) (acknowledging that there is no bright-line test for distinguishing between clarifying and substantive amendments). Among the factors

that guide our inquiry, three figure most prominently: (1) whether the amendment is included on the list of retroactive amendments found in U.S.S.G. § 1B1.10(c); (2) whether the Commission itself characterized the amendment as a clarification; and (3) whether the amendment resolves a circuit conflict. *See United States v. Aquino,* 242 F.3d 859, 865 (9th Cir.2001).

### 1. *Amendment 617's Absence from § 1B1.10(c)'s List of Retroactive Amendments*

The addition of application note 2(D) was one of several changes bundled in Amendment 617, the Commission's "Economic Crime Package":

> The major parts of the amendment are: (1) consolidation of the theft, property destruction, and fraud guidelines; (2) a revised, common loss table for the consolidated guideline, and a similar table for tax offenses; (3) a revised, common definition of loss for the consolidated guideline; (4) revisions to guidelines that refer to the loss table in the consolidated guideline; (5) technical and conforming amendments; and (6) amendments regarding tax loss.

U.S.S.G. Manual supp. app. C at 180 (2001).

 Amendment 617 is quite extensive. Spanning some 57 pages of the Supplement to the 2001 Guidelines Manual, the amendment makes several major and minor changes to the Guidelines' provisions addressing theft and financial crimes. Thus, it is not surprising that Amendment 617 does not appear on § 1B1.10(c)'s list of retroactive amendments. We agree with the government that the Commission clearly did not intend Amendment 617 to be applied retroactively *in its entirety.* However, that acknowledgment begins, rather than ends, our inquiry. The omission of Amendment 617 from the retroactivity list tells us nothing about the Commission's intent with respect to any *particular provision* in that mammoth amendment.

Analyzing the issue with varying degrees of detail, cases have found some provisions in Amendment 617 to be substantive changes in the law and some to be clarifications of existing law. *Compare United States v. Hartz,* 296 F.3d 595, 599 (7th Cir.2002) (holding that the revision of the enhancement for " 'affect[ing]' a financial institution" is an alteration of existing law because "the amendment substantively changes an unambiguous provision and because the Sentencing Commission did not characterize the amendment as a clarification"), *with United States v. Saunders,* 318 F.3d 1257, 1263–64 & n. 8 (11th Cir.2003) (concluding that the amendment's revision of the commentary relating to the meaning of "person in the business of receiving and selling stolen property" was a clarifying amendment (internal quotation marks omitted)). Because Amendment 617 both substantively alters *and* clarifies existing law, in different particulars, its exclusion from § 1B1.10(c)'s retroactivity list is not instructive.

### 2. *The Commission's Characterization of the Amendment*

Application note 2(D) is part of Amendment 617's revised definition of "loss" under the Guidelines. Like Amendment 617 itself, the revised loss definition may not be characterized as entirely substantive or entirely clarifying. The multi-purpose revised definition *"makes clarifying and substantive revisions* to the definitions of loss previously in the commentary to §§ 2B1.1 and 2F1.1, resolves a number of circuit conflicts, addresses a variety of application issues, and promotes consistency in application." U.S.S.G. Manual supp.

app. C at 185 (emphasis added).[6] That the Commission refers to the revised loss definition as making *both* substantive *and* clarifying changes complicates our inquiry into its characterization of the particular provision at issue here.

The government places great emphasis on the fact that the word "clarify" does not appear in the paragraph explaining the exclusion of interest and finance charges from the loss definition. In pertinent part, that paragraph provides:

> The amendment reflects a decision by the Commission that interest and similar costs shall be excluded from loss.... Thus, the rule resolves the circuit split regarding whether "bargained for" interest may be included in loss. [Comparing cases.] This rule is consistent with the general purpose of the loss determination to serve as a rough measurement of the seriousness of the offense and culpability of the offender and avoids unnecessary litigation regarding the amount of interest to be included.

*Id.* at 187–88.

For two reasons, we place little significance on the absence of the word "clarify" in that paragraph. First, our cases suggest that the Commission's characterization, while instructive, is not determinative. In *United States v. Washington*, 66 F.3d 1101, 1103–04 (9th Cir.1995), we held that an amendment to the Sentencing Guidelines was substantive *despite* the Commission's statement that the amendment was intended to clarify an existing provision. If we can reject the Commission's label altogether, then *a fortiori* we can supply one where it has not chosen either label.

Second, as the preceding logic suggests, we have held in a number of cases that an amendment clarifies an earlier guideline when the Commission simply failed to make explicit that an amendment was a clarification. *See, e.g., United States v. Flores*, 93 F.3d 587, 592 (9th Cir.1996); *United States v. Felix*, 87 F.3d 1057, 1060 (9th Cir.1996); *United States v. Helmy*, 951 F.2d 988, 995 (9th Cir.1992). Thus, our oft-repeated statement that an amendment to the Sentencing Guidelines will not be given retroactive effect unless it "plainly serve[s] to clarify pre-existing law, rather than to alter it," *United States v. Bishop*, 1 F.3d 910, 912 (9th Cir.1993), should not be read to mean that an amendment will not be given retroactive effect unless the amendment plainly *states* that it clarifies pre-existing law.

Because the Commission characterized the revised definition of loss as both a substantive *and* a clarifying amendment, and in the absence of an affirmative characterization of the change as "substantive," we are reluctant to place dispositive weight on the absence of the word "clarify" in the paragraph explaining the exclusion of interest. The Fourth Circuit has decided that a similarly worded provision of Amendment 617's revised definition of loss applies retroactively without the benefit of an explicit statement by the Commission that the amendment is a clarification. *United States v. Miller*, 316 F.3d 495, 502 (4th Cir.2003). Thus, rather than resolving the issue, the Commission's silence on whether application note 2(D) is a clarifying or substantive amendment requires us to look to the "circumstances surrounding the relevant guideline and its amendment."

---

**6.** Amendment 617 consolidated Sentencing Guidelines §§ 2B1.1 and 2F1.1. Those provisions were identical with respect to the inclusion of interest. Thus, an amendment that clarifies the earlier version of § 2B1.1 applies with equal force to § 2F1.1, the Guideline at issue in this case.

*United States v. Martinez,* 946 F.2d 100, 102 (9th Cir.1991).

Similarly, the use of the term "decision"—to which the government attaches great significance—is of little help. In context, the "decision" that the Commission made was to resolve the extant circuit split on the question whether contractual interest should be included in the loss calculation. We turn next to the significance of the Commission's choice in that regard.

### 3. *Resolution of a Circuit Conflict*

██ Chief among the circumstances we examine when deciding whether to apply an amendment retroactively is the role of the amendment in harmonizing previously conflicting circuit precedent. "An amendment that resolves a circuit split generally clarifies and does not modify existing law." *Sanders,* 67 F.3d at 857. Other circuits, similarly, emphasize the resolution of conflicting interpretations of ambiguous provisions in the Sentencing Guidelines when deciding whether to apply an amendment retroactively. *See Hartz,* 296 F.3d at 599 (listing, among factors to consider, "whether the amendment resolves an ambiguity in the original wording of the guideline").

As noted above, the interest-exclusion amendment resolved a conflict between two equally reasonable interpretations of the Sentencing Guidelines' definition of loss. As the First Circuit explained in *Goodchild:*

This is a close issue and we must acknowledge that there is to some degree a conflict between the cited cases and the language of the Commentary. The conflict is due to a clash between the ambiguous language used in the Commentary and the complexity of what constitutes "interest" and when it is an integral part of the value of the "money, property or services unlawfully taken."

Our holding will not solve the problem; such resolution lies with the Sentencing Commission.

25 F.3d at 65–66 (citation omitted). Because the challenged amendment is the result of the Commission's efforts to resolve a circuit conflict, and a reasoned and reasonable conflict at that, this factor weighs heavily in favor of concluding that the amendment is a clarification.

Although acknowledging that the amendment was intended to resolve a circuit split, the government contends that the amendment nonetheless is a substantive change in the law because the amendment changed the law of *this* circuit. In *Johns,* 5 F.3d at 1270, we concluded that an amendment to the Guidelines was a substantive change in the law, in part because the amendment overruled circuit precedent and retroactive application might violate the ex post facto clause. However, we later held that, when "the ex post facto clause is not implicated," an amendment may be considered clarifying notwithstanding the fact that the amendment changes the law of *this* circuit. *Sanders,* 67 F.3d at 857. *Sanders'* holding is a sound one. If all amendments that overruled a circuit's own precedent were deemed substantive, an amendment would be a clarification, and therefore retroactive, only in those circuits whose prior case law already was *consistent* with the amendment. Any benefit of retroactive application would be entirely illusory, and the Commission's resolution of the circuit split would create uniformity more slowly.

Amendment 617 made several substantive and clarifying changes to the Sentencing Guidelines' definition of loss for financial crimes. In amending the Guidelines' commentary to make explicit that the exclusion of interest applies to both contractual and opportunity cost interest, the Commission intended to resolve a circuit

conflict between two equally reasonable interpretations of the loss definition in the earlier version of the Guidelines. In view of that intention, and the ambiguity of the earlier definition, we hold that the amendment was a clarification of existing law. Reading § 2F1.1 in the light of application note 2(D), we conclude that the district court erred by including interest and finance charges in the amount of loss under § 2F1.1.

## C. *The Restitution Order*

Pursuant to the Victim and Witness Protection Act of 1982 ("the Act"), 18 U.S.C. § 3663A, the district court ordered Defendants to pay restitution to the victim banks in the amount of $533,529.83. Although Defendants are jointly and severally liable under the court's restitution order, only Morgan challenges that order. Morgan argues that the court erred in including interest and finance charges in its determination of the victim banks' loss. Although this argument is similar to the sentencing argument, the governing statute is different, and so is the analysis.

■■ "We have held that the Act permits restitution 'only for losses directly resulting from the defendant's offense.' " *United States v. Koenig*, 952 F.2d 267, 275 (9th Cir.1991) (quoting *United States v. Kenney*, 789 F.2d 783, 784 (9th Cir.1986)). "[T]he phrase 'directly resulting' means that the conduct underlying the offense of conviction must have caused a loss for which a court may order restitution, but the loss cannot be too far removed from that conduct." *United States v. Gamma Tech Indus., Inc.*, 265 F.3d 917, 928 (9th Cir.2001).

■■ Morgan's argument that interest and finance charges did not directly result from the offense conduct in this case is foreclosed by *United States v. Catherine*, 55 F.3d 1462 (9th Cir.1995). After affirm-

ing the defendant's conviction for making false statements on a loan application, we held that the district court properly included prejudgment interest in the restitution order. *Id.* at 1465. Noting that "actual loss" has slightly different meanings under the Act than under § 2F1.1, we explained that the difference flows from the different purposes served by the two statutes:

> Loss under 18 U.S.C. § 3663 is the *actual loss*. In addition, under 18 U.S.C. § 3663, restitution can include prejudgment interest, whereas the guidelines state that loss "does not, for example, include interest the victim could have earned on such funds had the offense not occurred." U.S.S.G. § 2F1.1, comment. (n.7). The different method of calculating loss in each case is due to the different purposes behind the two statutes. A defendant's culpability will not always equal the victim's injury.

*Catherine*, 55 F.3d at 1464–65 (some citations omitted).

In its revised definition of loss, the Commission saw no reason to distinguish between contractual interest and finance charges, on the one hand, and "opportunity cost" interest, on the other. We see no reason to draw such a distinction in the context of restitution orders, either. Indeed, after holding that contractual interest may not be included in the loss calculation under § 2F1.1, the court in *Hoyle* concluded that the district court properly had included contractual interest in its restitution order. 33 F.3d at 420. Applying the logic of *Catherine* and *Hoyle*, we hold that the district court did not abuse its discretion by including contractual interest and finance charges in its restitution order.

## CONCLUSION

We AFFIRM Goodman's conviction and the district court's restitution order. We

VACATE Defendants' sentences and RE-MAND for resentencing consistent with this opinion and consistent with *Blakely v. Washington*, —— U.S. ——, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004).