**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
 *Plaintiff-Appellee,*

v.

LANCE VAN ALSTYNE,
 *Defendant-Appellant.*

No. 07-50105

D.C. No.
CR-98-00118-
AHS-1

OPINION

Appeal from the United States District Court
for the Central District of California
Alicemarie H. Stotler, District Judge, Presiding

Argued and Submitted
March 9, 2009—Pasadena, California

Filed October 22, 2009

Before: Michael Daly Hawkins, Marsha S. Berzon and
Richard R. Clifton, Circuit Judges.

Opinion by Judge Berzon

**COUNSEL**

James H. Locklin (argued), Sean K. Kennedy, Los Angeles, California, for defendant-appellant Lance Van Alstyne.

Douglas F. McCormick (argued), Thomas P. O'Brien, Robb C. Adkins, Santa Ana, California, for plaintiff-appellee the United States of America.

**OPINION**

BERZON, Circuit Judge:

Lance Van Alstyne appeals his conviction for money laundering and the sentence imposed by the district court following a limited remand. After Van Alstyne filed his appeal to this court but before briefing, the Supreme Court decided *United States v. Santos*, 128 S.Ct. 2020 (2008), which addressed — with less than clear results, as will appear — the meaning of the money laundering statute.

Van Alstyne now argues that *Santos* requires us to reverse his money laundering conviction. We agree in part. We hold that *Santos* undermines our earlier approach to determining whether funds arising from a specified illegal activity constitute "proceeds" for the purposes of the money laundering statute, 18 U.S.C. § 1956, and requires a reversal of Van Alstyne's money laundering conviction for two of the three money laundering counts. As to the third count, we affirm the conviction as consistent with *Santos*. We agree with Van Alstyne that the district court erred in calculating the enhance-

ment to the money laundering sentence under U.S.S.G. § 2S1.1, in determining his fraud offense level under U.S.S.G. § 2F1.1(b)(1), and in imposing the restitution requirement, and so remand for reconsideration of those portions of Van Alstyne's sentence.

## FACTS AND PROCEDURAL BACKGROUND

Van Alstyne defrauded approximately 450 victims through a Ponzi scheme involving a number of companies that he organized for that purpose. The fraudulent scheme, begun in 1992, was built around thirteen oil and gas limited partnerships. These partnerships, LEM Pacific Income Fund I-IV, Sandstone Gas Fund I-V, and American Gas Fund I-IV, were controlled by Van Alstyne. Other companies he owned or controlled, Liberty Energy Management and Sabre Asset Management, served as the general partners for the limited partnerships. Continental Mineral Acquisitions and Blake Energy Corporation, two acquisition companies also owned by Van Alstyne, purchased oil and gas properties on behalf of the limited partnerships.

Van Alstyne perpetuated the scheme by selling interests in the limited partnerships to elderly and retired investors. Victims were solicited by brokers from Coastline Financial and Merchant Banking Services, both of which were, at the time, broker/dealers registered with the National Association of Securities Dealers (NASD).[1] Van Alstyne required the brokers to adhere to a script that described a safe investment with a more than ten percent annual return, backed by AAA-rated government bonds. Only after making their initial investments did the victims receive a printed prospectus disclosing that the investments were in fact risky and that losses could result from fluctuations in oil and gas prices. Nonetheless, because

---

[1]Although Van Alstyne eventually acquired all the stock of Merchant Banking Services, Coastline Financial was owned by Donald Williams. Van Alstyne may have exercised some control over Coastline Financial.

victims received distribution checks shortly after making their initial investments, they believed they had invested wisely and often re-invested when contacted by brokers. In reality, the distribution checks were largely funded not by oil and gas revenues but by the investors' own principal.[2]

The scheme began to unravel in October 1994, when NASD shut down Van Alstyne's sales operation, Merchant Banking Services. Although Van Alstyne's agents continued to peddle partnership interests, new investments slowed. Shortly thereafter, Van Alstyne sent a letter to investors, revealing that the distributions they had received so far were not, in fact, oil and gas revenues, but instead a return of their own principal. The letter explained that distributions were made by refunding the investors' principal "so that the distributions could begin immediately rather than waiting until the production proceeds were actually received." Henceforth, the letter indicated, investors would receive only their share of the oil and gas revenue. Investors testified that when they contacted Van Alstyne to address concerns his letter raised, he reassured them that "everything was going to be all right" and that investors could continue to expect distribution checks. Distribution checks did in fact continue to arrive but at a much slower pace — quarterly, instead of monthly — and in vastly decreased amounts. Some of the complaining investors received checks refunding some or all of their contributions, although at least some were unable to cash the checks because of insufficient funds.

Van Alstyne was forced to cut back operations in 1995. From then until 1998 investors received only sporadic distribution checks, sometimes for amounts as low as a few cents. In the end, the investors collectively invested more than $10 million in the limited partnerships and received a total distri-

---

[2]Nor were the investments backed by safe government bonds. Zero-coupon bonds with a maturity of thirty-eight years were bought for only two of the limited partnerships and were sold within three months.

bution of approximately $2 million. Van Alstyne made off with more than $2 million in salary and payments from the various companies he had set up to carry out this scheme.[3]

In October 1998, a federal grand jury returned an amended indictment charging Van Alstyne with nineteen counts of mail fraud in violation of 18 U.S.C. § 1341 and three counts of money laundering in violation of 18 U.S.C. § 1956(a)(1)(A)(i). The money laundering charges were based on three specific transactions: Counts 20 and 21 involved transfers of funds, one in January 1994 and one in June 1994, from the acquisition company Blake Energy Corporation to one of the limited partnerships. Trial testimony revealed that these transfers were made for the purpose of making distributions to individual investors. Count 23 involved a transfer of funds from Blake Energy to a limited partnership, executed in November 1994 — that is, after the scheme began to unravel. Testimony elicited at trial indicated that this transfer was made to refund one investor's entire outlay.

In June 2001, after a three-week trial, a jury returned a guilty verdict on seven of the mail fraud counts and all three counts of money laundering. Van Alstyne was sentenced to a 290-month prison term (approximately 24 years), three years of supervised release, a special assessment of $5,000, and restitution of more than $9 million. Van Alstyne appealed, and this court affirmed his convictions and his sentence.[4] *United States v. Van Alstyne*, 87 Fed. Appx. 640 (9th Cir. 2004). The Supreme Court subsequently granted Van Alstyne's petition for certiorari, vacated his sentence, and remanded for recon-

---

[3]As the district court noted, this calculation leaves "several million dollars [ ] unaccounted for."

[4]The judgment of conviction entered by the district court listed a prison term of 300 months. This court issued a limited remand to the district court for the sole purpose of amending the judgment to reflect the 290-month sentence imposed orally. *See United States v. Van Alstyne*, 77 Fed. Appx. 937 (9th Cir. 2003), *superseded and corrected by United States v. Van Alstyne*, 89 Fed. Appx. 7 (9th Cir. 2004).

sideration in light of *United States v. Booker*, 543 U.S. 220 (2005). *See Van Alstyne v. United States*, 543 U.S. 1116 (2005). On remand, this court affirmed Van Alstyne's convictions and remanded his sentence for reconsideration pursuant to *United States v. Ameline*, 409 F.3d 1073 (9th Cir. 2005) (en banc). *United States v. Van Alstyne*, 143 Fed. Appx. 45 (9th Cir. 2005).

Pursuant to the *Ameline* remand, the trial judge determined that she would have imposed a materially different sentence had the guidelines not been mandatory and resentenced Van Alstyne to a 216-month prison term, three years of supervised release, a special assessment of $500, and $9 million in restitution. The new sentence required that, if any restitution remains unpaid after Van Alstyne's release, it shall be paid in "nominal" monthly payments of $10,000 each, as "the court finds that the defendant's economic circumstances do not allow for either immediate or future payment of the amount owed." Van Alstyne timely appealed.

## II.    ANALYSIS

### A.    Effect of *Santos* on Van Alstyne's Money Laundering Conviction

[1] Van Alstyne was convicted of three counts of money laundering, in violation of 18 U.S.C. § 1956(a)(1). That section provides, in relevant part:

> Whoever, knowing that the property involved in a financial transaction represents the *proceeds* of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the *proceeds* of specified unlawful activity . . . with the intent to promote the carrying on of specified unlawful activity . . . shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transaction, which-

ever is greater, or imprisonment for not more than twenty years, or both.

18 U.S.C. § 1956(a)(1)(A)(i) (emphasis added).[5] The statute defines "specified unlawful activity" by enumerating certain predicate offenses, including "any act or activity constituting an offense listed in [18 U.S.C.] section 1961(1)." 18 U.S.C. § 1956(c)(7). Mail fraud, prohibited under 18 U.S.C. § 1341, is one such listed offense. 18 U.S.C. § 19.

## 1.

We begin by closely examining the *Santos* decision, as it is both the substantive and procedural predicate for Van Alstyne's challenge to the money laundering conviction.

[2] The defendant in *Santos* operated an illegal lottery in bars and restaurants in Indiana. Santos employed "runners" to gather bets from gamblers and to deliver the funds to "collectors." The collectors in turn delivered the money to Santos, who used some of it to pay the runners' commissions, the collectors' salaries, and the lottery's winners. *Santos*, 128 S.Ct. at 2022-23. These payments to the runners, collectors, and winners formed the basis of an indictment charging Santos with both running an illegal gambling business and money laundering. A majority of the Court held that the term "proceeds," as applied to Santos' offenses, refers to the "profits" of the criminal activity, not to the operation's "gross receipts," and that Santos' payments to runners, collectors and winners constituted regular expenses, rather than profits, of the illegal gambling business. *Id.* at 2031.

[3] Van Alstyne contends that his payments to investors were no different than those held insufficient to sustain Santos' money laundering conviction because the payments were

---

[5]Unless otherwise indicated, all references are to the 2006 edition of the U.S. Code.

"necessary for the operation to continue." Our evaluation of this argument is seriously hampered by the fact that there is no majority opinion in *Santos*. Instead, there is a four-justice plurality opinion, authored by Justice Scalia, and a concurrence by Justice Stevens, enunciating quite different reasoning from that of the plurality. Addressing Van Alstyne's argument thus requires us to figure out the precedential impact of the Supreme Court's fractured analysis in *Santos*.

**[4]** According to the *Santos* plurality, "proceeds," left undefined in § 1956, *could* mean either profits or gross receipts, and the rule of lenity weighs in favor of the more defendant-friendly profits definition. *Santos*, 128 S.Ct. at 2024-25. This view of the statute was buttressed, according to the plurality, by what it termed the "merger problem": Functioning lotteries will, presumably, pay their winners. Such payments from gross receipts are intended to promote the illegal lottery. Equating proceeds with gross receipts would therefore turn nearly every violation of the illegal lottery statute, 18 U.S.C. § 1955, into a simultaneous violation of § 1956, the money laundering statute, thereby "radically increas[ing]" the sentence. *Id*. at 2026-27.[6]

The four dissenting justices would have interpreted "proceeds" as "the total amount brought in," *id.* at 2035 (Alito, J., dissenting), and leave the "so-called merger problem" to be dealt with at sentencing. *Id.* at 2044.

**[5]** Justice Stevens provided the fifth vote for the result reached by the plurality — that Santos' payments to lottery winners and runners were not "proceeds" within the meaning of the money laundering statute. *Id*. at 2033 (Stevens, J., concurring). But Justice Stevens rejected the plurality's across-the-board application of the rule of lenity, citing the legisla-

---

[6]The illegal lottery statute provides for a sentence of up to five years, 18 U.S.C. § 1955(a). Violations of the money laundering statute are punishable with sentences up to twenty years. 18 U.S.C. § 1956(a)(1).

tive history of § 1956 as evidence that Congress intended "proceeds" to encompass gross revenues when the predicate crime involved the sale of contraband. *Id*. at 2032 & n.3. Justice Stevens reasoned that "proceeds" may mean "profits" with respect to one predicate crime and "receipts" with respect to another, a result rejected by both the plurality and the dissent. *Id*. at 2030, 2035-36.

The Court was divided not only over the meaning of "proceeds" but also over the holding of the case, in light of the fractured vote on the merits. Ordinarily, when "no single rationale explaining the result enjoys the assent of five Justices," the holding is limited to the narrowest grounds supporting the result. *Marks v. United States*, 430 U.S. 188, 193 (1977). The plurality, minus Justice Thomas, insisted that the holding of *Santos* under the *Marks* rule is that " 'proceeds' means 'profits' when there is no legislative history to the contrary." *Santos*, 128 S.Ct. at 2031. Justice Stevens disputed that characterization of his own opinion, explaining that his conclusion was driven by the conviction that Congress could not have intended the "perverse result" (the merger of the predicate crime and the money laundering statute) that the receipts definition would entail where the predicate crime was an illegal lottery. *Id.* at 2034 n.7. The dissenters, seizing on Justice Stevens's discussion of organized crime and contraband, observed that five justices would have applied the "gross receipts" definition to these crimes. *Santos*, 128 S.Ct. at 2035-36 & n.1.

In light of this two-tier disarray, appellate courts have struggled to glean what, if any, new rule of law the divergent opinions of the *Santos* Court established. The Third Circuit interpreted *Santos* broadly, as holding that "the term 'proceeds,' as that term is used in the federal money laundering statute, applies to criminal profits, not criminal receipts, derived from a specified unlawful activity." *United States v. Yusuf*, 536 F.3d 178, 185 (3rd Cir. 2008). The Eleventh Circuit took the opposite view, noting *Santos*' "limited preceden-

tial value" and concluding that its "narrow holding . . . that the gross receipts of an unlicensed gambling operation were not 'proceeds' " did not apply to a defendant who laundered funds gained from illegal drug trafficking. *United States v. Demarest*, 570 F.3d 1232, 1242 (11th Cir. 2009). The Fifth Circuit noted that "the precedential value of *Santos* is unclear outside of the narrow factual setting of that case, and the decision raises as many issues as it resolves for the lower courts." *United States v. Brown*, 553 F.3d 768, 783 (5th Cir. 2008).[7]

Our circuit has mentioned *Santos* only in passing and in doing so failed to note that the plurality view did not command a majority of justices: *United States v. Lazarenko*, 564 F.3d 1026 (2009), stated that the Supreme Court "concluded that the term ['proceeds'], left undefined in the statute, was ambiguous as to whether it meant 'profits' or 'receipts,' and so defined it in the more defendant-friendly terms of 'profits,' based on the rule of lenity." *Id.* at 1039. In fact, the reasoning described in *Lazarenko* was that of the plurality but not that of Justice Stevens, who provided the fifth vote for reversing the conviction. *Lazarenko*'s misdescription of *Santos* was in no way relevant to our resolution of the *Lazarenko* case, and so is not binding on us.[8] While *Lazarenko*'s mischaracteriza-

---

[7]In *Brown*, where the predicate crime was distribution of controlled substances, the court ultimately declined to reach the issue of *Santos*' precise parameters, holding instead that even if the plurality's profits definition governed this case, the defendants' distribution of prescription drugs was undoubtedly profitable and thus fit within that definition. *Brown*, 553 F.3d at 784.

[8]The panel in *Lazarenko* invoked *Santos* only for the purpose of "reaffirming the principle that when a term is undefined, we give it its ordinary meaning." *Lazarenko*, 564 F.3d at 1039 (internal quotation omitted). The *Lazarenko* panel then distinguished the case at bar by noting that "extortion," unlike "proceeds," has an unambiguous, common law meaning. *Id.* Thus, *Lazarenko* correctly relied on *Santos* for the proposition that the term "proceeds" is ambiguous, a view shared by a majority of justices. The passing suggestion that the plurality's specific definition of 'proceeds' applies beyond the facts of *Santos* was quite beside the point for which *Lazarenko* relied on *Santos*.

tion of *Santos'* holding is thus dicta, it illustrates the difficulty courts have encountered in turning the splintered *Santos* opinions into an intelligible rule of law.

**2.**

**[6]** Before proceeding further to determine the import of *Santos* for this case, we pause to address the government's assertion that this court's earlier decision affirming Van Alstyne's conviction precludes us from now considering the impact of *Santos*. As the government recognizes, where a defendant appeals after an *Ameline* remand, issues raised but not decided on an earlier appeal are properly before the court. *United States v. Thornton*, 511 F.3d 1221, 1226-27 (9th Cir. 2008). Although the defendant in *Thornton* sought review of his sentence rather than his conviction, it is well settled that "in the context of a criminal prosecution, finality is normally defined by the imposition of the sentence." *United States v. LaFromboise*, 427 F.3d. 680, 683 (9th Cir. 2005) (internal quotation omitted).[9] We therefore hold that challenges to a defendant's conviction may be reviewed on appeal from an Ameline remand, where, as in *Thornton*, the challenge was raised in an earlier appeal.

---

[9]*LaFromboise* considered the date on which a conviction becomes final for the purposes of the deadline for filing a habeas petition under 28 U.S.C. § 2255. However, the proposition that a conviction does not become final until the sentence is final is consistent across a spectrum of caselaw addressing different facets of criminal law. *See, e.g.*, *Flanagan v. United States*, 465 U.S. 259, 263 (1982) (holding that the Court of Appeals lacked jurisdiction to review order disqualifying counsel before defendant had been tried and sentenced); *Flynt v. Ohio*, 451 U.S. 619, 620 (1981) (holding that the Supreme Court lacked jurisdiction to review Ohio Supreme Court's decision remanding for trial because the Court can only review final judgments, defined by the imposition of a sentence); *Berman v. United States*, 302 U.S. 211, 212 (1937) ("Final judgment in a criminal case means sentence," so a court's suspension of the sentence did not render defendant's appeal interlocutory.).

In his previous appeal, Van Alstyne argued that insufficient evidence existed to support his conviction, a claim we reviewed *de novo* because Van Alstyne had timely moved for judgment of acquittal. *United States v. Van Alstyne*, 87 Fed. Appx. at 641. The panel rejected the insufficient evidence contention. *Id.* at 642 (citing *United States v. Sayakhom*, 186 F.3d 928, 941 (9th Cir. 1999)). Van Alstyne is now again appealing his conviction on insufficient evidence grounds, maintaining that, given *Santos*, he could not be convicted of money laundering.

**[7]** Not surprisingly, the government contends that the law of the case doctrine forecloses consideration of Van Alstyne's *Santos* argument.[10] The law of the case doctrine provides that "one panel of an appellate court will not as a general rule reconsider questions which another panel has decided on a prior appeal in the same case." *United States v. Scrivner*, 189 F.3d 825, 827 (9th Cir. 1999) (quoting *Merritt v. Mackey*, 932 F.2d 1317, 1320 (9th Cir. 1991)). "The doctrine is a judicial invention designed to aid in the efficient operation of court affairs . . . not an inexorable command." *United States v. Smith*, 389 F.3d 944, 948-49 (9th Cir. 2004) (internal quotations omitted). Moreover, "[a] court may depart from the law of the case if . . . an intervening change in the law has occurred." *Scrivner*, 189 F.3d at 827.

**[8]** *Santos* represents precisely the type of intervening change that the law of the case exception recognizes. Before *Santos*, Ninth Circuit precedent established that gross receipts from a specified illegal activity always satisfied the "proceeds" prong of § 1956. *See, e.g.*, *United States v. Akintobi*, 159 F.3d 401, 403 (9th Cir. 1998) (defining proceeds as "that which is obtained . . . by any transaction"); *United States v.*

---

[10]The government also cites the rule of mandate doctrine, but that doctrine applies to district court proceedings following remand, not to the scope of a second appeal. *See United States v. Thrasher*, 483 F.3d 977, 981 (9th Cir. 2007), *cert. denied*, 128 S.Ct. 2052 (2008).

*Savage*, 67 F.3d 1435, 1442 (9th Cir. 1995) ("The money that investors sent to the Savage program constitutes the 'proceeds' of the mail fraud."). Our across-the-board application of the receipts definition plainly does not square with *Santos*, which, at a minimum, requires us to apply the "profits" definition where the specified illegal activity is an illegal lottery, and, depending on the view one takes concerning what rule the fractured decision established, may apply to some set of other statutes as well. To the extent our caselaw posited a uniform application of the "receipts" definition, it is inconsistent with *Santos*.

Moreover, *Akintobi* relied on dictionary definitions of "proceeds" to arrive at its conclusion that the term encompassed all gross receipts from illegal transactions. *See Akintobi*, 159 F.3d at 403. Both the *Santos* plurality and Justice Stevens rejected this line of reasoning as an authoritative interpretive method with respect to this statute. *See Santos*, 128 S.Ct. at 2023-24 (opinion of Scalia, J.) (dictionary definition is ambiguous); *id.* at 2031-32 (opinion of Stevens, J.) (same). We are "bound not only by the holdings of [the Supreme Court's] decisions but also by their mode of analysis." *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc) (internal quotations omitted). So, even if *Santos* does not clearly establish new law with respect to every predicate crime, it sufficiently undercut *Akintobi* to require that we address anew the meaning of "proceeds" in the money laundering context.

**3.**

**[9]** We therefore inquire whether *Santos* established a new rule of law that, as applied to Van Alstyne's case, compels us to conclude that there was insufficient evidence for his conviction. Having conducted that inquiry, we hold that *Santos* requires reversal of two counts of Van Alstyne's money laundering convictions — those based on money transfers carried out for the purpose of distributions to individual investors — but not the third count, which involved a transfer for the pur-

pose of refunding the entire amount that one investor had entrusted to Van Alstyne.

**[10]** Only the desire to avoid a "merger problem" united the five justices who held that Santos' payments to winners and runners did not constitute money laundering. Otherwise, Justice Stevens' analysis diverged from that of both the plurality and the principal dissent.[11] But, as the plurality noted, "[t]he merger problem is not limited to lottery operators. For a host of predicate crimes, merger would depend on the manner and timing of payment for the expenses associated with the commission of the crime." *Santos*, 128 S.Ct. at 2026 (plurality opinion). We therefore view the holding that commanded five votes in *Santos* as being that "proceeds" means "profits" where viewing "proceeds" as "receipts" would present a "merger" problem of the kind that troubled the plurality and concurrence in *Santos*.[12] The Sixth Circuit has also concluded that the existence of a "merger" problem is central to the meaning of "proceeds" after *Santos*. *See United States v. Kratt*, 579 F.3d 558, 562 (6th Cir. 2009) (holding that proceeds "means profits only when the § 1956 predicate offense creates a merger problem that leads to a radical increase in the statutory maximum sentence and only when nothing in the legislative history suggests that Congress intended such an increase."). *See also United States v. Williams*, 435 F.3d 1148, 1157 (9th Cir. 2006) (holding that to apply *Marks*, "[w]e need not find a legal opinion which a majority joined,

---

[11]*See Santos*, 128 S.Ct. at 2032 n.3 (Stevens, J.) ("I cannot agree with the plurality that the rule of lenity must apply to the definition of 'proceeds' for [the sale of contraband]."); *id.* at 2030 (Scalia, J.) (rejecting Justice Stevens' argument that "proceeds" could mean "profits" with respect to operating an illegal lottery but "receipts" with respect to sale of contraband.).

[12]We note that Congress subsequently amended the money laundering statute to expressly define proceeds to include gross receipts. 18 U.S.C. § 1956(c)(9) (2009). Our task, therefore, is to determine how the *Santos* Court would interpret "proceeds" with respect to mail fraud committed prior to the statute's amendment in May 2009.

but merely a legal standard which, when applied, will necessarily produce results with which a majority of the Court in that case would agree.") (citation and quotation omitted). *See also Smith v. Univ. of Wash. Law School*, 233 F.3d 1188, 1200 (2000) (While a majority of Justices in *Regents of the Univ. of Cal. v. Bakke*, 438 U.S. 265 (1978), would have permitted academic institutions to take race into account, "Justice Powell's analysis is the narrowest footing upon which a race-conscious decision making process could stand.").

**[11]** Our question, then, is whether mail fraud is, or can be, a crime presenting the "merger" problem that was a fulcrum consideration for the *Santos* plurality and concurrence. Mail fraud has two elements: "(1) having devised or intending to devise a scheme to defraud (or to perform specified fraudulent acts), and (2) use of the mail for the purpose of executing, or attempting to execute, the scheme (or specified fraudulent acts)." *Carter v. United States*, 530 U.S. 255, 261 (2000); *see also Bridge v. Phoenix Bond & Indem. Co.*, 128 S.Ct. 2131, 2138 (2008). The Supreme Court has emphasized that 18 U.S.C. § 1341 prohibits "the 'scheme to defraud' rather than the completed fraud. . . . ," *Neder v. United States*, 527 U.S. 1, 25 (1999), and that a mailing need only be "incident to an essential part of the scheme" to satisfy the second element. *Bridge*, 128 S.Ct. at 2138.

**[12]** In Van Alstyne's case, issuing distribution checks that supposedly represented generous returns on his victims' investment was a central component of the "scheme to defraud." Doing so directly inspired investors to send more money to Van Alstyne's funds, which could then be used to pay returns to other investors. The very nature of the scheme thus required some payments to investors for it to be at all successful. In sending the January and June distribution checks funded by the money transfer that was charged as money laundering, Van Alstyne "enter[ed] into a transaction paying the expenses of his illegal activity," *Santos*, 128 S. Ct. at 2027 (plurality opinion). Convicting Van Alstyne of money

laundering for the bank transfers inherent in the "scheme" central to the mail fraud charges thus presents a "merger" problem closely parallel to the one that underlay the majority result in *Santos*.

We recognize that not all mail fraud schemes will involve payments that could implicate the "merger" problem. In *Bridge*, for example, the mail fraud scheme hinged on the defendants' false attestations of compliance with a particular rule for bidding on tax liens that deprived competing bidders of a fair opportunity to participate in the auction. *Bridge*, 128 S.Ct. at 2136. The scheme itself required no payments.

*Santos* suggests, however, that the "profits" definition of "proceeds" should apply where the particular crime at issue depends on necessary payments, as it does here. The plurality noted that "any wealth-acquiring crime with multiple participants would become money-laundering when the initial recipient of the wealth gives his confederate their shares," *Santos*, 128 S.Ct. at 2026-27. The "merger" problem may therefore be triggered when multiple participants share profits, regardless of whether the predicate crime would overlap with money laundering if executed by a single criminal. This language indicates that our analysis of the "merger" problem in the mail fraud context must focus on the concrete details of the particular "scheme to defraud," rather than on whether mail fraud generally requires payments of the kind implicated in *Santos*.

**[13]** Moreover, all of the particular counts of mail fraud for which Van Alstyne was convicted involved transmissions of checks to investors, not the misrepresentations with which the investments were first induced. The government is therefore quite wrong to suggest that the mail fraud and money laundering crimes are separate in the mail fraud context because "the fraud was complete once the victim's [sic] were induced to part with their money based on defendant's misrepresentations." To the contrary, it appears that many, if not all, of the fraud counts of which Van Alstyne was convicted could have

been charged as money laundering as well, sharply illustrating the "merger" problem.

**[14]** The transaction in November that fully refunded one investor's outlay cannot, however, be regarded as a crucial element of the "scheme to defraud." The November 1994 transaction refunded the full amount invested by James and Evelyn Easley, in response to their complaints after the scheme began to unravel. The Ponzi scheme depended on attracting new investments and using some but not all of the amount collected to pay returns to earlier investors. Returning the entire amount of the Easleys' investment to them undermined rather than advanced the core scheme, as the funds returned to them would not be available to lull other investors into maintaining their investment. At the same time, returning the Easleys' investment was intended to "promote the carrying on," 18 U.S.C. § 1956(a)(1)(A)(i), of the "scheme" at the heart of the mail fraud counts, by discouraging detection of that scheme. As the mail fraud "scheme" and money laundering elements are distinct with regard to this money laundering count, we affirm that count.

**[15]** In sum, we reverse Van Alstyne's money laundering conviction as to counts 20 and 21 but affirm as to count 22.

## B.   Challenges to Van Alstyne's Sentence

Van Alstyne raises several objections to his sentence. We review the interpretation of the sentencing guidelines de novo, *see United States v. Williamson*, 439 F.3d 1125, 1137 n.12 (9th Cir. 2006), and review the district court's factual findings for clear error, *United States v. Maldonado*, 215 F.3d 1046, 1050 (9th Cir. 2000). We review the district court's restitution order for abuse of discretion, provided that it is within the bounds of the statutory framework. *See United States v. Gordon*, 393 F.3d 1044, 1051 (9th Cir. 2004).

**1.**

Van Alstyne argues that the district court erred by imposing an 8-level enhancement because "the value of the funds" exceeded $6 million. *See* U.S.S.G. § 2S1.1 (1993).[13] Van Alstyne contends that the court erred by including in this amount the distributions and refunds to investors, commissions to brokers, and funds used to purchase oil and gas investments. The government's response is that even if *Santos* narrowed the meaning of "proceeds," the reference to "funds" in § 2S1.1 implies that all money associated with the scheme is to be included for purposes of calculating the enhancement.

[16] The term "funds" cannot be interpreted in a vacuum. The Guidelines specifically refer to 18 U.S.C. § 1956 and point out that the "statute covered by this guideline . . . prohibits financial transactions involving funds that are the proceeds of 'specified unlawful activity.' " U.S.S.G. § 2S1.1, cmt. background. As later amendments clarified, the Guidelines impose enhancements based on the amount of funds that were laundered within the meaning of the statute. *See* U.S.S.G. § 2S1.1 (2008) & cmt. n.1 (conditioning the sentencing enhancement on the value of "laundered funds" and defining "laundered funds" as "the property, funds, or monetary instrument involved in the transaction . . . in violation of 18 U.S.C. § 1956 . . . ."). Although the sentencing court could take into account uncharged (and even acquitted) conduct that constitutes money laundering, *see United States v. Lawton*, 193 F.3d 1087, 1094 (9th Cir. 1999); U.S.S.G. § 1B1.3(a)(2), the Guidelines do not contemplate a base level enhancement on account of transactions that do *not* constitute money laun-

---

[13]Neither party disputes that Van Alstyne was properly sentenced pursuant to the 1993 edition of the Guidelines. *See Johnson v. Gomez*, 92 F.3d 964, 968 (9th Cir. 1996) (if applying the version of the Guidelines in effect at the time of sentencing would result in an *ex post facto* violation, the district court must apply the version in effect at the time of the offense).

dering within the meaning of the statute. Therefore, transactions that involve the payment of commissions, legitimate purchases of oil and gas properties, and periodic distributions to investors such as those involved in counts 21 and 22 may not be considered for the purpose of calculating the guidelines enhancement. Full refunds such as the one involved in count 23 are, however, properly considered under § 2S1.1.

**2.**

[17] Van Alstyne argues that the district court also miscalculated the offense level for the fraud counts.[14] Under U.S.S.G. § 2F1.1(b)(1), the offense level is adjusted based on the amount of loss incurred because of the fraud. The district court imposed a fifteen-level enhancement, based on a total loss of more than $10 million. In arriving at the $10.7 million figure, the district court relied on *United States v. Munoz*, 233 F.3d 1117, 1125-26 (9th Cir. 2000), which used a "risk theory of loss" method to calculate the applicable amount. Applying this method, the district court considered the total amount of money invested by the scheme's victims, without allowing for offsets of amounts returned to investors through distribution checks and refunds. Van Alstyne contends that a subsequent amendment to the sentencing guidelines clarified the appropriate method for calculating losses in Ponzi schemes and rejected the approach taken in *Munoz*, and that his sentence should be vacated and remanded for calculation of the proper Guidelines range for the fraud counts in light of the intervening amendment. We agree.

---

[14]Van Alstyne acknowledges that the higher offense level for the money laundering counts determined his sentencing range under the Guidelines. The offense level for the money laundering counts was 37, which included an eight level increase because the value of the laundered funds was calculated to exceed $6 million. Our conclusion that the eight level increase must be reversed, *see supra* Part II.B.1, raises the possibility that the money laundering sentence could, on remand, be lower than the adjusted offense for the fraud counts, which was 33. As sentencing issues with respect to Van Alstyne's fraud convictions could thus arise on remand, we address those arguments here.

In 2001, Amendment 617 revised several guidelines sections relating to economic crimes. *See United States v. Morgan*, 376 F.3d 1002, 1011 (9th Cir. 2004). Among other changes, the amendment added the following language:

> In a case involving a fraudulent investment scheme, such as a Ponzi scheme, loss shall not be reduced by the money or the value of the property transferred to any individual investor in the scheme in excess of that investor's principal investment (i.e., the gain to an individual investor in the scheme shall not be used to offset the loss to another individual investor in the scheme).

U.S.S.G. § 2B1.1, cmt. n.3(F)(iv) (2008). This language only prohibits reductions for any *profits* made by investors in Ponzi schemes, not directly addressing whether the amount of loss should be reduced by any partial return of a victim's investment. The notes accompanying the amendment, however, make clear that the implication of the new standard is that returns to investors up to the amount invested do not count as losses, and that *Munoz* is thus no longer good law.

The Commission explained that the amendment "resolves a circuit conflict regarding whether and how to credit payments made to victims," U.S.S.G. App. C at 690 (2008), referring to decisions by the Second, Fourth, and Fifth Circuits that essentially adopted the "risk of loss" theory applied in *Munoz*: "*Compare . . . United States v. Deavours*, 219 F.3d 400 (5th Cir. 2000) (intended loss is not reduced by any sums returned to investors).". *Id.* The Commission then cited *United States v. Holiusa*, 13 F.3d 1043 (7th Cir. 1994), which held, in the words of the Commission, "that only the net loss should be included in loss, thus allowing a credit for returned interest," and *United States v. Orton*, 73 F.3d 331 (11th Cir. 1996), which provided that payments to losing investors could be credited, but not payments to investors who profited. The Commission went on to state unequivocally that the amend-

ment adopts the approach in *Orton*. U.S.S.G. App. C at 690 (2008). The language of the amendment appears designed to differentiate *Orton* from *Holiusa*, which permitted Investor X's net gain to offset Investor Y's net loss, and so to rest on the *Overton* principle that payments to losing investors up to the amount of their investment do not count as losses. *See United States v. Setser*, 568 F.3d 482, 497 (5th Cir. 2009) (holding that the amendment in question superseded *Deavours*). We therefore hold that *Munoz* has been superseded by the amended § 2B1.1 and that the rule of *Orton* now applies.

[18] We further hold that the amendment clarifies, rather than substantively alters, the Guidelines and therefore must be applied to Van Alstyne on remand. *See United States v. Aquino*, 242 F.3d 859, 865 (2001). Relevant factors in considering whether an amendment is substantive or clarifying include "(1) whether the amendment is included on the list of retroactive amendments found in U.S.S.G. § 1B1.10(c); (2) whether the Commission itself characterized the amendment as a clarification; and (3) whether the amendment resolves a circuit conflict." *Morgan*, 376 F.3d at 1011. In *Morgan*, we noted that "the Commission clearly did not intend Amendment 617 to be applied retroactively *in its entirety*," and so "look[ed] to the circumstances surrounding the relevant guideline and its amendment" to determine whether the application note at issue was clarifying or substantive. *Id.* at 1011-12 (internal quotation omitted). We held that "the Commission's efforts to resolve a circuit conflict, and a reasoned and reasonable conflict at that . . . weighs heavily in favor of concluding that the amendment is a clarification."[15] *Id.* at 1013.

Here too, the change was made for the express purpose of resolving a conflict among the circuits that resulted from reasonable though differing interpretations of the Guideline. We

---

[15]As in this case, the amendment in *Morgan* changed the law of this circuit. *See Morgan*, 376 F.3d at 1013.

therefore conclude that the amendment must be applied retro-actively. *See United States v. Alfonso*, 479 F.3d 570, 572 (8th Cir. 2007) ("[T]he parties agree that [Application Note 3(F)(iv)] was properly relied upon because it simply clarified the meaning of the term 'loss.' "). Accordingly, in recalculat-ing the fraud offense level on remand, the district court shall reduce the amount of loss by the amount of funds returned to investors up to the amount invested, but not by the amount, if any, of any profit made by any investors.

**3.**

[19] Van Alstyne also challenges the imposition of a four-level enhancement premised on the district court's conclusion that he derived more than $1 million in gross receipts from an offense that affected a financial institution. Under the 1993 edition of the guidelines, the offense level is increased by four levels where the offense "affected a financial institution and the defendant derived more than $1,000,000 in gross receipts *from the offense*." § 2F1.1(b)(6)(B) (1993) (emphasis added). The applicable provision was modified in 2001 to read, "if . . . the defendant derived more than $1,000,000 in gross receipts *from one or more financial institutions* as a result of the offense, increase by 2 levels." U.S.S.G. § 2B1.1(b)(14) (2008) (emphasis added).[16] The Commission offered the following explanation of the change:

> The enhancement also was modified to address issues about what it means to "affect" a financial institution and how to apply the enhancement to a case in which there are more than one financial insti-tution involved. Accordingly, the revised provision focuses on whether the defendant derived more than $1,000,000 in gross receipts from one or more finan-cial institutions as a result of the offense.

---

[16]Van Alstyne concedes that the change from a four- to a two-level enhancement is a substantive amendment that does not apply retroactively to him.

U.S.S.G. App. C at 685 (2008). Van Alstyne notes that he received only $39,000 *from* a financial institution, Coastline Financial. Thus, if the amendment applies, Van Alstyne's offense level should not have included the additional four-level enhancement.

[20] Once again, the issue is whether the 2001 amendment to former Guideline § 2F1.1(b)(6)(B) was clarifying or substantive. The circuits that have addressed this question have concluded that the amendment is substantive and may not be applied retroactively. *See United States v. Amico*, 573 F.3d 150, 151 (2d Cir. 2009); *United States v. Monus*, 356 F.3d 714, 718 (6th Cir. 2004); *United States v. Swanson*, 360 F.3d 1155, 1166-67 (10th Cir. 2004); *United States v. Hartz*, 296 F.3d 595, 599 (7th Cir. 2002). We agree. The plain language of the earlier version unambiguously conveyed that it applied if the offense generated more than $1 million from any source and also affected a financial institution; under this language any impact on a financial institution would do. *See United States v. Greene*, 212 F.3d 758, 761 (3rd Cir. 2000) (holding that these two elements were "separate and distinct prerequisites"). The amended language makes equally clear that the enhancement only applies if gross receipts in excess of $1 million are derived *from* a financial institution. *See Hartz*, 296 F.3d at 599. Under this language, the only effect on a financial institution that counts is money flowing from a financial institution into the defendant's coffers. As there was a substantive change from the time he committed the offense, Van Alstyne may not take advantage of the more lenient sentencing guideline on remand.

**4.**

Van Alstyne raises his objection to the restitution ordered for the first time on appeal. We therefore review the restitution aspect of the sentence for plain error. *United States v. Olano*, 507 U.S. 725, 732 (1993) (a court may reverse when the error is plain, "affects substantial rights," and "seriously

affects the fairness, integrity or public reputation of judicial proceedings") (internal citations and alterations omitted). Van Alstyne contends that the district court erred in calculating the restitution amount and in ordering monthly payments of $10,000. We agree.

**[21]** Van Alstyne argues, and the government apparently agrees, that a mathematical error resulted in an improper calculation of the total restitution owed. We so hold. The presentence report arrived at the total amount owed by deducting $1,536,180 that had been distributed to investors from Van Alstyne's gross receipts of $10,737,000. This calculation ignored an additional $332,308 in distributions and $756,791 in refunds made after the scheme began to unravel in 1995. The total amount of restitution ordered should have been $8,111,721.

**[22]** The court also erred in ordering $10,000 monthly restitution payments. At the time of Van Alstyne's charged offenses, the Victim Witness Protection Act (VWPA) provided that "[t]he court, in determining whether to order restitution . . . shall consider the amount of the loss sustained by any victim as a result of the offense, the financial resources of the defendant [and] the financial needs and earning ability of the defendant and the defendant's dependents." 18 U.S.C. § 3664(a) (1994).[17] The presentence report indicates that at the time of sentencing Van Alstyne's monthly income was $5 to

---

[17]All of the charged offenses occurred before the enactment of the Mandatory Victim Restitution Act, which amended §§ 3663 and 3664, took effect in 1996, although the fraudulent scheme continued for some time thereafter. Presumably as a result, this appeal has been litigated by both parties on the assumption that the 1996 amendments do not apply, and we proceed on that basis as well.

In addition to the VWPA, the Pre-Sentence Report and the District Judge relied on the authority of the Senior Citizens Against Marketing Scams Act of 1994 (SCAMS), 18 U.S.C. § 2327 (1994), to order restitution. As Van Alstyne notes, and the government does not dispute, SCAMS is not applicable here.

$25 and that he was liable for a civil judgment of $1,530, a $210,642 tax lien, $10,781 in late child support payments, and almost $700,000 in restitution payments to victims pursuant to a NASD proceeding. Van Alstyne has a high school education and limited work experience. He filed for bankruptcy in the early 1990s.

**[23]** Based on this information, the district court found that "the defendant's economic circumstances do not allow for either immediate or future payment of the full amount." The court nonetheless ordered Van Alstyne to make "nominal" restitution payments of $10,000 per month during the three-year period of supervised release following his release from prison. Ten thousand dollars per month cannot be called "nominal." *See Cummings v. Connell*, 402 F.3d 936, 943 (9th Cir. 2005) (nominal damages "customarily are defined as a mere token or 'trifling' ").[18] Nor does the record provide any basis for concluding that Van Alstyne will be able to afford to pay $10,000 per month following his release.

We recognize that the VWPA "does not require express findings on [the defendant's resources and earning ability] and grants the district court broad discretion in the kind and amount of evidence." *United States v. Ramilo*, 986 F.2d 333, 335 (9th Cir. 1993). Nonetheless, "at the time restitution is ordered, the record must reflect *some* evidence the defendant may be able to pay restitution in the amount ordered in the future." *Id.* at 336 (emphasis added).

The only possible bases for concluding that Van Alstyne

---

[18]*Cummings* defined "nominal" in the context of damages for vindicating constitutional rights when no quantifiable injury is proven, rather than in the restitution context; nonetheless, its characterization of the term is instructive.

We do not disturb the portion of the restitution order requiring Van Alstyne to pay at least $25 per quarter during his prison term, an amount that is accurately characterized as "nominal."

was capable of satisfying the $10,000 monthly payments are observations in the original Presentence Report that "several million dollars remain unaccounted for" and that Van Alstyne had the motive to conceal funds acquired through the Ponzi scheme. The court made no finding, however, that Van Alstyne actually still had access to the monetary fruits of his crime, nor did the court indicate that it disbelieved the financial information Van Alstyne submitted at resentencing. Indeed, if the court believed that Van Alstyne retained millions of dollars from his fraudulent scheme, there would have been no reason to delay the $10,000 monthly payments until after his release. Moreover, unsupported speculation that a defendant has secreted funds would not constitute an evidentiary basis for assessing the defendant's ability to repay.

[24] "A district court's failure to make a restitution order with which a defendant could possibly be expected to comply threatens respect for judicial orders generally." *United States v. Bailey*, 975 F.2d 1028, 1032 (4th Cir. 1992). On remand, the court shall recalculate the total amount owed and either order restitution amounts that are truly "nominal" or identify some evidence in the record that indicates Van Alstyne's ability to pay a higher monthly amount upon release.

## III.   CONCLUSION

[25] Counts 21 and 22 of Van Alstyne's conviction are REVERSED, count 23 is AFFIRMED, and his sentence is VACATED and REMANDED.