# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

Nos. 10-2487/3580

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | |
| vs. | * | |
| | * | |
| Sholom Rubashkin, | * | |
| | * | |
| Appellant. | * | |
| _____ | * | |
| | * | |
| American Civil Liberties Union of | * | Appeal from the United States |
| Iowa; National Association of Criminal | * | District Court for the |
| Defense Lawyers; Washington Legal | * | Northern District of Iowa. |
| Foundation; Albert Alschuler; William | * | |
| Bassler; Douglas A. Berman; L. Barrett | * | |
| Boss; Robert J. Cleary; Nora V. | * | |
| Demleitner; Monroe H. Freedman; | * | |
| Bennett L. Gershman; Jeff Ifrah; Harold | * | |
| J. Krent; Marc Miller; Michael O'Hear; | * | |
| Stephen Orlofsky; Mark Osler; James | * | |
| Reynolds; Stephen F. Smith; Sandra | * | |
| Guerra Thompson; Ronald Wright, | * | |
| | * | |
| Amici on behalf of Appellant. | * | |

_____

Submitted: June 15, 2011
Filed: September 16, 2011

_____

Before RILEY, Chief Judge, MURPHY and SMITH, Circuit Judges.
_____

MURPHY, Circuit Judge.

A jury convicted Sholom Rubashkin of 86 counts of bank, wire, and mail fraud; making false statements to a bank; money laundering; and violations of an order of the Secretary of Agriculture. The district court[1] sentenced Rubashkin to 324 months, the low end of the guideline range. Rubashkin appeals from the denial of his motion for a new trial based on the judge's failure to recuse and from the adverse judgment, arguing that the district court abused its discretion in its scheduling order, evidentiary rulings, and jury instructions; that there was insufficient evidence of money laundering; and that his sentence was flawed and unreasonable. We affirm.

I.

Sholom Rubashkin managed Agriprocessors, Inc., a kosher meatpacking company in Postville, Iowa that employed over a thousand people at one point. Rubashkin also owned other small businesses and institutions in Postville, including a grocery store and a school. In 1999 Agriprocessors opened a revolving loan with First Bank Business Capital (the Bank), a subsidiary of St. Louis based First Bank. The loan was secured by Agriprocessors' collateral, primarily inventory and accounts receivable. By 2008 the daily loan balance usually exceeded $30 million.

Customer service employees testified at Rubashkin's multiweek trial about two ways in which Agriprocessors inflated its accounts receivable to increase its borrowing ability. First, under Rubashkin's direction, Agriprocessors employees created false invoices and bills of lading, increasing the value of the accounts

_____

[1]The Honorable Linda R. Reade, Chief Judge, United States District Court for the Northern District of Iowa.

-2-

receivable. Some of the false invoices involved customers who had in fact prepaid their orders. Others named as customers businesses that were not involved with Agriprocessors itself, such as a clothing store. When false invoices were accidentally sent to real customers, Rubashkin instructed his employees to tell them the mailing was a mistake. It was later estimated that false invoices allowed Agriprocessors to inflate its borrowing ability by roughly $10 million.

Agriprocessors also inflated its accounts receivable by diverting some of its customer payments away from the bank account in which the loan agreement specified they should have been deposited. Employees instead deposited the payments into an Agriprocessors account at another bank. The checks were sent to that bank in rounded amounts so they would appear to be something other than customer payments. Rubashkin requested that employees delay the entry of the customer payments into the Agriprocessors accounting system, thereby inflating the company's accounts receivable.

Because Agriprocessors' revolving loan with the Bank capped the amount of money that could be borrowed, the company needed to pay down the loan to borrow additional funds. At Rubashkin's instruction employees deposited funds from Agriprocessors' operating account (which included loan proceeds obtained from the Bank under the revolving loan agreement) into the accounts of a kosher grocery store and a private school called Torah Education, both controlled by Rubashkin. The school and grocery store then wrote checks payable to Agriprocessors which were deposited into the account designated in Agripocessors' loan agreement. These checks were drawn in odd amounts so that they would appear to be genuine customer payments. This diversion of funds allowed Agriprocessors to pay down its revolving loan without revealing hidden customer payments, thereby inflating its accounts receivable by an additional $3 million. These payments from the school and grocery store gave rise to Rubashkin's money laundering charges.

The credit agreement between Agriprocessors and the Bank contained covenants requiring the company to comply with the Packers & Stockyards Act of 1921, 7 U.S.C. §§ 181–229c (Packers Act). It also included a covenant that required Agriprocessors to represent to the Bank that the company was not in violation of any law that would adversely affect the collateral or its business or operations.

The majority of Agriprocessors workers were undocumented immigrants. In May 2008, Immigration and Customs Enforcement (ICE) conducted the nation's largest worksite immigration action at the Agriprocessors plant. ICE arrested almost four hundred of its employees for immigration violations and criminally charged most of them. Around that time, Rubashkin received letters from the United States Attorney's office (USAO) in the Northern District of Iowa indicating that he was the target of a federal investigation for financial and immigration crimes.

Rubashkin was arrested in November 2008 and ultimately indicted in 163 counts. He was charged with fourteen counts each of bank and wire fraud, 18 U.S.C. §§ 1343, 1344; nine counts of mail fraud, id. § 1341; ten counts of money laundering and aiding and abetting the same, id. §§ 2, 1956(a)(1)(A)(i), (B)(i); twenty four counts of false statements to a bank, id. § 1014; and twenty counts of willful violations of orders of the Secretary of Agriculture under the Packers Act and aiding and abetting the same, 7 U.S.C. § 195, 18 U.S.C. § 2 (collectively the financial counts). He was also charged with sixty nine counts of harboring undocumented aliens for profit, 8 U.S.C. §§ 1324(a)(1)(A)(iii), (A)(iv), (A)(v)(II), (B)(i); one count of conspiracy to do the same, id. §§ 1324(a)(1)(A)(v)(I), (B)(i); one count of conspiracy to commit document fraud, 18 U.S.C. § 371; and one count of aiding and abetting document fraud, id. §§ 2, 1546(a) (collectively the immigration counts).

Agriprocessors filed for bankruptcy while Rubashkin's trial was pending, and a trustee was appointed.

## II.

The district court severed the immigration counts from the other charges in the indictment and scheduled the financial charges to be tried first over Rubashkin's objection. After reviewing jury questionnaires from a potential jury pool which reflected the wide publicity the immigration action had received in the area, the district court moved the trial from its Iowa district to Sioux Falls, South Dakota.

After Rubashkin was indicted, but prior to his final superseding indictment and trial, an Agriprocessors employee moved for the district court's recusal in a related immigration fraud case. United States v. Martin De La Rosa-Loera, No. 08-1313 (N.D. Iowa Aug. 13, 2008). The movant raised a claim of bias or prejudice that focused on the district court's involvement in arranging for necessary interpreters, lawyers, and facilities prior to the immigration arrests at Agriprocessors. Id.; see 28 U.S.C. § 455(a). The district court denied the motion to recuse in an order explaining the need to prepare for processing hundreds of anticipated immigration arrestees, which included arranging for visiting judges to travel to Waterloo, Iowa to handle arraignments. The district court described its involvement as "limited . . . to [its] role as Chief Judge" and acknowledged "an obligation to litigants and [the court's] colleagues not to remove [itself] needlessly."

Rubashkin's counsel was aware of this order and its contents but did not move for the district court's recusal at his trial or for any related discovery. Nor did he object to the deadline the district court had set for recusal motions. After that deadline had passed, Rubashkin made a Freedom of Information Act request to ICE for records regarding its meetings with the USAO and the district court.

Rubashkin's trial on the financial charges focused on Agriprocessors' fraudulent inflation of collateral. The government also introduced some evidence related to immigration violations which was relevant to the fraud charges. The

-5-

indictment alleged that Agriprocessors had fraudulently told the bank it was not "in violation of any law, statute, [or] regulation . . . which . . . would in any respect materially and adversely affect the collateral . . . or [Agriprocessors'] property, business, operations, or condition." The immigration evidence both provided an alternative theory of bank fraud and formed the basis for fifteen counts of false statements to a bank. 18 U.S.C. § 1014.

To rebut the allegation that Rubashkin knowingly violated immigration law, he offered evidence during the defense case that Agriprocessors had retained counsel for advice on immigration matters. The district court excluded that evidence as irrelevant and also under Federal Rule of Evidence 403. At the close of the government's case Rubashkin moved for a judgment of acquittal on the money laundering charges, which the district court denied.

The jury heard eighteen days of evidence and considered over nine thousand pages of exhibits. It returned special verdicts on each of the fraud, false statements to a bank, and money laundering charges. The special verdict forms required the jury not only to answer guilty or not guilty on each charge of the indictment but also to specify what type of activity gave rise to the finding of guilt. It convicted Rubashkin on all seventy one charges of bank, mail, and wire fraud; money laundering; and false statements to a bank. It also convicted him of fifteen counts of willful violations of orders of the Secretary of Agriculture, while acquitting him of five such counts. At sentencing the court received testimony and letters describing Rubashkin's charity, family life, and community importance. Former Department of Justice leaders argued against a life sentence.

In calculating Rubashkin's guideline range, the district court found that his frauds caused a loss to the Bank of $27 million, which was the unpaid balance on its loan minus its recoveries from collateral. An FBI agent testified that inflated collateral had induced the bank to increase the Agriprocessors loan by roughly $12

million.  Based in part on a $27 million loss figure, see U.S.S.C. § 2B1.1(b)(1)(L), the district court calculated Rubashkin's guideline range as 324 to 405 months.  It then sentenced Rubashkin to serve 324 months.

Around the time of his sentencing, Rubashkin obtained the records he had requested under FOIA over a year earlier.  The records reflected meetings between the district court and ICE personnel before any indictment.  Representatives of the USAO were also present.  The records included emails and reports of meetings relating to the need for facilities to handle the anticipated arrests for immigration violations.  These documents appeared to be internal memoranda and unedited notes taken by ICE personnel in the author's own words, rather than quotations from meeting participants.  It is not clear from the documents whether ICE's first contact with the district court was with the clerk of court or if ICE approached the chief judge directly about its logistical needs.

According to the minutes, the chief judge met with ICE and USAO personnel before the surprise action at the plant to discuss the need for judges, interpreters, defense counsel, and detention facilities to handle hundreds of expected arrestees. Arrangements included setting up temporary court offices near Postville, providing dozens of mobile office trailers for defense counsel, and renting a nearby stadium to house prospective arrestees. The agencies also received information about open dates on the district court's calendar.  There is no indication in the minutes that the meetings with the district court concerned any other type of prosecution.

The minutes also show that before the immigration action the USAO "briefed" the district court on the large number of simultaneous arrests it anticipated, the need for additional judges, interpreters, and courtrooms, and for advance arrangements "with the United States Public Defenders office."  Another set of minutes attributed to the district court "full support for the initiative," and an email between two ICE officials referred to the district court as a "stakeholder."  The court appeared "willing

to support the immigration operation in any way possible" through "staffing and scheduling." The district court would keep its calendar open on the anticipated dates of the immigration arrests.

A few months before the surprise immigration action, the district court purportedly "requested a briefing on how the operation [would] be conducted" and set a deadline for a "final gameplan." The record also contains a slide presentation from ICE that mentioned previous enforcement actions against Agriprocessors relating to environmental, agricultural, and safety matters. It is unclear if the district court ever viewed those slides. There is no indication that the district court ever saw any of the ICE emails or minutes or had any opportunity to edit them.

Two months after his sentencing, Rubashkin filed a motion under Federal Rule of Criminal Procedure 33, arguing that his FOIA evidence warranted a new trial. He moved in the alternative that the court order discovery related to it. He also requested that his new trial motion be assigned to a different judge. The district court denied the motions in a detailed twenty page order. The district court stated that the ICE memoranda had not revealed anything about the preparations for the enforcement action that had not previously been made public in the De La Rosa-Loera recusal proceedings. The district court took issue with the wording of the ICE memoranda and explained that it had "not pledge[d] to 'support the operation in any way possible.'" The court stated that it had never been informed of "the targets of the prosecutions . . . or even where the worksite enforcement action was to take place," since its "planning was limited to ensuring that a sufficient number of judges, court-appointed attorneys and interpreters would be available and that the court would be able to function efficiently at an off-site location."

Rubashkin now appeals from the district court order denying a new trial and the judgment, challenging scheduling and evidentiary rulings, the jury instructions, the sufficiency of the evidence of his money laundering convictions and his sentence.

Amici American Civil Liberties Union of Iowa and the National Association of Criminal Defense Lawyers submitted briefs supporting Rubashkin's argument for a new trial. A group of amici law professors submitted a brief arguing for a lower sentence.

## III.

Rubashkin argues that the district court's meetings with ICE and prosecutors created an appearance of partiality that warranted recusal. Rubashkin never moved for recusal while his case was pending, however. Instead, he moved months after sentencing for a new trial under Rule 33(b). That rule allows district courts to vacate a conviction and grant a new trial on the basis of newly discovered evidence. Rule 33 motions are disfavored and reviewed for a clear abuse of discretion, a rigorous standard. United States v. Baker, 479 F.3d 574, 577 (8th Cir. 2007). Rubashkin now appeals from this denial of his Rule 33(b) motion requesting a new trial.[2]

A successful Rule 33(b) movant must show that:

(1) the evidence [was] unknown or unavailable to the defendant at the time of trial;

(2) the defendant [was] duly diligent in attempting to uncover it;

(3) the newly discovered evidence [is] material; and

(4) the newly discovered evidence . . . probably will result in an acquittal upon retrial.

Id. (emphasis added). The government argues that Rubashkin has not met the first and fourth elements of the Rule 33 requirements. Indeed, Rubashkin was aware

---

[2]Rubashkin also argues that a new trial is required due to alleged prosecutorial misconduct resulting from the preraid meetings between representatives of the USAO and the court. The cases he cites all deal with Brady violations, however. See, e.g., United States v. White, 492 F.3d 380, 408-13 (6th Cir. 2007); United States v. Duke, 50 F.3d 571, 576-78 (8th Cir. 1995).

before trial of the agency coordination with the district court, and the evidence he presents is unlikely to result in acquittal.

Rubashkin argues that the last element, probability that new evidence will result in acquittal, does not apply to Rule 33 motions when they are based on a trial's fairness as opposed to potential innocence. He concedes that the evidence he puts forward does not relate to acquittal, but he cites several cases from other circuits to support his claim that the evidence need not relate to the question of innocence so long as it relates to "another issue of law." United States v. Beasley, 582 F.2d 337, 339 (5th Cir. 1978) (per curiam). Most of the cited cases discuss the possibility of a new trial following discovery of a Brady violation. See, e.g., id.; United States v. Campa, 459 F.3d 1121, 1151 (11th Cir. 2006) (en banc). Because a Brady violation involves the withholding of exculpatory evidence from the defense, such cases are far more likely to result in an acquittal than the court's meetings about facilities for the expected arrestees. Rubashkin also relies heavily on the case of Holmes v. United States, 284 F.2d 716 (4th Cir. 1960), where a Rule 33 motion resulted in a new trial because of a deputy's comments at trial that one of the defendants was staying at a local jail serving a six year sentence. Id. at 718. There, the new evidence bore "upon the integrity of the jury's verdict." Id. at 720. Rubashkin has not shown here that the court's pretrial meetings prejudiced the jury's verdict.

Rubashkin essentially seeks an exception to the required showing of probable acquittal, but the standard in our circuit for a Rule 33 motion is clear and binding. Baker, 479 F.3d at 577. The rule requires that the newly discovered evidence "probably will result in an acquittal." Id. Since Rubashkin concedes that his new evidence would not likely affect the jury's verdict on retrial, the district court did not err in denying his Rule 33 motion. We therefore need not consider whether Rubashkin met the other requirements of Rule 33.

-10-

Even if we were to construe Rubashkin's arguments as raising the issue of recusal for the first time on appeal, he still would not prevail. Recusal is required "in any proceeding in which [a judge's] impartiality might reasonably be questioned." 28 U.S.C. § 455(a). A recusal motion must be "timely made," Fletcher v. Conoco Pipe Line Co., 323 F.3d 661, 664 (8th Cir. 2003) and we have explained that "[t]imeliness requires a party to raise a claim 'at the earliest possible moment after obtaining knowledge of facts demonstrating the basis for such a claim.'" Id. (quoting Apple v. Jewish Hosp. & Med. Ctr., 829 F.2d 326, 333 (2d Cir. 1987)). Rubashkin did not make a timely recusal motion after he learned through court documents filed in the related case of De La Rosa-Loera that the district court had attended logistical meetings with federal agencies . Instead, he waited until after his conviction and his sentencing before raising the issue.

In cases where the issue of recusal is raised for the first time on appeal, our review is for plain error and "[w]e will only reverse if the error prejudiced [Rubashkin's] substantial rights . . . and would result in a miscarriage of justice." Id. at 663-64. Because Rubashkin did not move for recusal during trial, he effectively argues that the district court erred in not recusing itself sua sponte. We have never found that a district court plainly erred in this manner, and we are reluctant to do so now. See United States v. Sypolt, 346 F.3d 838, 839 (8th Cir. 2003). Our approach is consistent with that of the Supreme Court, which has held that recusal is not necessarily required even after a district court has expressed "impatience, dissatisfaction, annoyance, and even anger" toward a party. Id. (quoting Liteky v. United States, 510 U.S. 540, 555–56 (1994)). There is nothing like that in this record.

Similarly, cases in which courts have found that recusal was required under § 455(a) due to bias deal with situations where the judge failed to make any disclosure of potential bias before or during trial. See, e.g., Liljeberg v. Health Servs. Acquisition Corp., 486 U.S. 847, 850 (1988). Here, the defendant was aware of the district court's pretrial involvement before the immigration action. Rubashkin also

points to cases requiring recusal where there was an apparent association between the judge and the prosecution, such as where the trial judge had been the U.S. Attorney during the time the defendant was investigated, United States v. Arnpriester, 37 F.3d 466, 467 (9th Cir. 1994), or where the judge met with the prosecutors and provided them with assistance during grand jury deliberations. Schmidt v. United States, 115 F.2d 394, 397-98 (6th Cir. 1940). There is simply nothing approaching that type of conduct here.

The district court's rulings and statements to the jury reveal no evidence of bias or prejudice toward Rubashkin. He offers no reason to believe that the jury would have reached a contrary result under a different presiding judge. After studying the lengthy record we find no evidence that the district court's decision to remain on the case prejudiced Rubashkin's verdict. We conclude that the district court did not err by denying Rubashkin's motion for a new trial.

IV.

Rubashkin sought separate trials on the immigration and financial charges in his indictment. The district court granted his motion, severing the immigration trial from the financial trial. It agreed that a jury would be overwhelmed by reviewing all of the evidence and issues in a single trial or proceeding, becoming "unable to compartmentalize the evidence." The court also expressed its concern that the jury might "cumulate the evidence as to the various counts" despite any limiting instruction. Moreover, four additional defendants were indicted in the immigration counts which the district court saw as a complicating factor warranting severance. The financial charges were scheduled for the initial trial. After the jury convicted Rubashkin on most of them, the immigration charges were dismissed by the government.

Rubashkin argues on appeal that the district court erred in scheduling the financial trial first and raises a number of evidentiary points which are reviewed under the abuse of discretion standard. United States v. Muhlenbruch, 634 F.3d 987, 1001 (8th Cir. 2011). Rubashkin further argues that the court's jury instructions were improper because they conflated the mental state required for fraud with that required for harboring illegal aliens.

A.

Over Rubashkin's objection the district court granted codefendant Brent Beebe's request that the financial trial proceed first. Beebe had been charged only with immigration offenses; trying the financial offenses first allowed him more time to prepare without delaying either trial.

The financial trial concerned Rubashkin's charges for bank, wire, and mail fraud; false statements to a bank; money laundering; and violations of an order of the Secretary of Agriculture. The bank fraud charges were grounded in three theories. The first was that each time Agriprocessors requested additional loan funds from the Bank it made false statements of compliance with the law because it was in fact violating immigration law and the Packers Act. The second and third theories of bank fraud involved the diversion of accounts receivable collateral and the creation of false collateral. Charges of false statements to a bank were similarly based on false statements of compliance with the law and misrepresentation of the company's accounts receivable.

The charges for mail and wire fraud were based on Agriprocessors' requests for additional funds under the revolving loan agreement with the Bank. Money laundering charges were based on payments by the grocery store and Torah Education made to look like customer payments and deposited in the designated account used

to pay down the revolving loan. These payments allegedly contained funds acquired through bank fraud, wire fraud, mail fraud, and making of false statements to a bank.

Rubashkin's final group of financial charges were for violating an order of the Secretary of Agriculture, stemming from Agriprocessors' failure to pay the full purchase price of livestock on time.

In an immigration trial Rubashkin would have faced charges for employing and harboring undocumented aliens for profit, conspiring to commit document fraud, and for aiding and abetting. The government argues that some evidence related to the immigration charges was relevant to Rubashkin's fraud violations and should therefore be introduced in his financial trial.

Rubashkin argues that if the order of trials had been reversed, immigration related evidence would have been unnecessary at the financial trial since he would either have been acquitted of the immigration charges or could have stipulated to the immigration violations. The government responds that Rubashkin's acquittal on the immigration charges would not have prevented its use of such evidence in a subsequent financial trial because his knowledge of immigration violations by other Agriprocessors employees would have been relevant to his charges for false statements to a bank. It also points out that it would not have been obliged to accept any stipulation to the immigration charges. See Old Chief v. United States, 519 U.S. 172, 189 (1997).

The district court severed Rubashkin's immigration charges from the others to prevent the jury from being overwhelmed by reviewing all of the evidence and issues in one proceeding and being "unable to compartmentalize the evidence." The court also expressed concern that the jury might "cumulate the evidence as to the various counts" despite any limiting instruction. Moreover, Rubashkin had informed the court that he "may very well" testify in the immigration trial, but was "highly

-14-

[un]likely" to do so in the financial trial. Given the evidentiary overlap between the charges in the two trials, Rubashkin's testimony at an earlier immigration trial could have been used against him in a subsequent financial trial.

Under all the circumstances the district court's scheduling order was a practical solution given the nature and number of the charges. The district court did not abuse its discretion in trying the financial charges first.

B.

Rubashkin next challenges the district court's decision to permit evidence of immigration violations to show that Agriprocessors had broken a "law, statute, [or] regulation" in violation of its loan agreement with the Bank. The government argued that each time Agriprocessors requested funds, the company fraudulently reaffirmed its covenants because it falsely claimed to be acting legally. The evidence thus was relevant to the charges of bank, wire, and mail fraud as well as making false statements to a bank. Rubashkin attacks the government's grounds for admissibility as "startlingly attenuated" and asserts that such grounds have been rejected in False Claims Act cases. See, e.g., Rodriguez v. Our Lady of Lourdes Med. Ctr., 552 F.3d 297, 304 (3d Cir. 2008). Rubashkin offers no authority showing that the evidence admitted was not relevant in fraud cases, however.

Rubashkin argues that the district court abused its discretion in admitting evidence relating to immigration violations at his financial trial. Federal Rule of Evidence 403 affords district courts the discretion to exclude evidence whose "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." While focusing on the court's severance order, Rubashkin overlooks its provision that the order was a

"preliminary assessment . . . made in an evidentiary vacuum . . . [that] should not be construed as a ruling on any evidentiary dispute."

The government offered proof at trial of the fraud and false statement charges by introducing commercial documents, false invoices, testimony about various transactions, and the like. Rubashkin argues that this financial evidence was "bland" compared to some of that relating to the immigration charges. He contrasts the financial evidence from what he considers more colorful evidence, such as testimony about a separate payroll for undocumented employees and about a related meeting between Rubashkin and a manager behind a barn. He cites United States v. Weir, 575 F.2d 668 (8th Cir. 1978), in which the district court admitted evidence of Weir's attempt to murder an FBI informant to prove the defendants' identity and mental state in a bank robbery. Weir, 575 F.2d at 670. We reversed in Weir after concluding that the evidence prejudicially invited a guilty verdict because it tended to show "the defendants were 'bad' men and should be convicted because they were 'bad.'" Id. at 672.

Weir actually weakens Rubashkin's argument because it illustrates a good example of prejudicial evidence. In contrast, Rubashkin does not identify what was "lurid" or "incendiary" about the evidence introduced by the government in his trial. The fact that a meeting between Agriprocessors employees took place outside a barn is not unusual since the barn was on the company's property. The separate payroll is highly probative of the type of financial fraud with which he was charged. Evidence is not prejudicial merely because it "tells a colorful story with descriptive richness" that is more compelling than other available evidence. Old Chief v. United States, 519 U.S. 172, 187 (1997). The district court did not abuse its considerable discretion in admitting this evidence.

Rubashkin offered evidence that he had retained counsel for advice on immigration matters to rebut evidence that he had knowingly violated immigration

-16-

law. He argues that this evidence was improperly excluded because it was relevant to demonstrate that he had not knowingly made false statements to the Bank regarding his compliance with immigration laws. The district court excluded the evidence as irrelevant and under Rule 403, reasoning that it "just doesn't follow" that by "hiring a very respected attorney and . . . law firm, . . . Rubashkin . . . could not possibly have criminal intent." Rubashkin did not seek to introduce his attorneys' statements as part of an advice of counsel defense, but only the fact of their retention. That fact was not of great relevance to prove Rubashkin's innocent state of mind and could actually invite the opposite conclusion that he hired an attorney because he knew he was violating the law. To support his argument, Rubashkin cites only cases that involved the content of legal advice or statements made to an attorney by a client seeking advice, both of which would be far more probative of state of mind than mere retention of counsel.

Rubashkin's arguments objecting to exclusion of evidence about his retention of an immigration law attorney also fail because each of the fraud counts and almost all of the false statements to a bank counts were premised on other theories than the immigration law violations. The jurors were given special verdict forms on which they indicated that for each count of fraud or false statements they had found Rubashkin guilty based on an underlying offense separate from the immigration law violations. With the exception of one count of false statements to a bank which was premised solely on violations of immigration law, any error in ruling on this evidence would have been harmless because it would have had no effect on the verdict. See United States v. Worman, 622 F.3d 969, 976 (8th Cir. 2010). The district court did not abuse its wide discretion in excluding the evidence.

C.

Rubashkin further argues that the court erred in its jury instructions by incorrectly instructing the jury on the knowledge requirement necessary to be convicted of fraud. While jury instructions are usually reviewed under an abuse of

-17-

discretion standard, our review here is for plain error because Rubashkin did not object to this instruction at trial. United States v. Robertson, 606 F.3d 943, 954 (8th Cir. 2010).

Because the charges of fraud and false statements to a bank were premised in part on Rubashkin's statements to the Bank indicating compliance with all laws when Agriprocessors was in fact violating immigration law, the court instructed the jury on the elements of the offense of harboring illegal aliens. 8 U.S.C. § 1324. In giving this instruction the court included as one element of the offense that the defendant "knew, or recklessly disregarded the fact, that one or more aliens was not lawfully in the United States." While Rubashkin admits that this is the proper knowledge requirement for harboring an illegal alien, he urges that the instruction was improper because a fraud conviction requires proof of deliberate false representations. United States v. Ponec, 163 F.3d 486, 489 (8th Cir. 1998). He argues that instructing the jury on reckless disregard confused the jury and led it to apply the lesser standard of reckless disregard to the fraud charges.

Rubashkin's argument ignores the fact that the court properly instructed the jury on the mental state requirement for fraud before giving the instruction about harboring an illegal alien. The court stated:

> To act with "intent to defraud" means to act knowingly and with the intent to deceive someone for the purpose of causing some financial loss or loss of property to another or bringing about some financial gain to oneself or another to the detriment of a third party.

Thus, the court correctly instructed the jury on the mental state requirement for fraud and for the offense of harboring illegal aliens. Putting the two instructions together, they required the jury to find that Rubashkin knew that he or others at Agriprocessors were acting with at least reckless disregard as to whether its employees were lawfully in the United States. The jury instructions did not decrease the mental state

-18-

requirement for fraud. Since the jury is presumed to follow the court's instructions, United States v. Wisecarver, 598 F.3d 982, 989 (8th Cir. 2010), we see no plain error here.

In addition, Rubashkin argues that the instruction regarding harboring an illegal alien was incorrect because it did not require proof that the accused acted with knowledge or reckless disregard as to the illegal alien status of a particular individual. See United States v. Pereyra-Gabino, 563 F.3d 322 (8th Cir. 2009). In Pereyra-Gabino we held that an instruction on harboring an illegal alien, in violation of 8 U.S.C. § 1324(a)(1)(A)(iii), was erroneous because it had not required the jury to find that all elements of the offense were satisfied in respect to an individual alien. Id. at 328. This created a unanimity problem because the jury could "mix and match" each element of the offense among the aliens. Id. at 328–29. The jury could thus convict a particular defendant even though the jury had not unanimously found that his conduct satisfied each element of the offense.

This case differs from Pereyra-Gabino where harboring an illegal alien was the charged offense requiring jury unanimity. Rather, illegal alien evidence here was relevant to Rubashkin's charges for fraud and false statements to a bank. Furthermore, the violations of immigration law at issue in the financial trial were by the corporation Agriprocessors, not by Rubashkin individually, for he need not have been the one actually harboring aliens on behalf of the corporation. Because his offense was falsely stating that the company was in compliance with all laws, the court did not commit plain error with its instruction on harboring illegal aliens.

V.

In addition to convicting Rubashkin of seventy six counts of bank, mail, and wire fraud; false statements to a bank; and violations of an order of the Secretary of Agriculture, the jury also convicted him of ten counts of money laundering. With

-19-

respect to the money laundering counts, Rubashkin's indictment charged him with conducting transactions with the proceeds of the frauds and false statements for which he was ultimately convicted. The indictment specified ten different sets of transactions—one for each of the money laundering charges. Before each of the transactions, Rubashkin had checks from Agriprocessors' customers diverted away from the account specified in the company's loan agreement with the Bank and into Agriprocessors' accounts at a different institution. Accounting personnel delayed the entry of the payments into the company's accounting system. This inflated Agriprocessors' accounts receivable and increased its borrowing ability.

Because the loan agreement with the Bank limited the amount that could be borrowed at any one time in order to obtain additional funds Rubashkin needed a way to pay down the balance without using customer payments. To accomplish this, Rubashkin had Agriprocessors transfer funds to a grocery store and private school that he controlled. These funds included proceeds of the loans the company had received from the Bank. The grocery store and school in turn wrote checks to Agriprocessors which were deposited into the account designated for loan repayment in the loan agreement. Checks were drawn in odd amounts so that they appeared to be customer payments. These payments from the school and grocery were the transactions forming the basis for the money laundering convictions in the indictment.

Rubashkin argues that these convictions should be vacated because they are not separate transactions from those that gave rise to his fraud convictions. Specifically, he contends that because the money laundering charges arose from payments he caused the school and grocery store to make to repay the loan from the Bank, they were an essential part of the underlying fraud. The money laundering convictions merged with the predicate offenses according to Rubashkin and caused him to be punished twice for the same conduct, a sort of double jeopardy.

The government responds that the money laundering charges were distinct from the underlying crimes because a predicate offense found by the jury for all of Rubashkins' money laundering convictions was having made false statements to a bank. Because this crime was complete as soon as the false statements were made, the hidden rerouting of fraudulently obtained loan proceeds through the school and grocery store to pay down the loan were separate offenses and not a necessary part of his underlying fraud.

Rubashkin moved for a judgment of acquittal on his money laundering charges at the close of the government's case and again after the jury returned its verdict. The district court denied both motions. Because Rubashkin's arguments challenge the sufficiency of the evidence and federal statutory interpretation, our review is de novo. United States v. Spencer, 592 F.3d 866, 879 (8th Cir. 2010); United States v. Stanko, 491 F.3d 408, 413 (8th Cir. 2007).

The offense of money laundering prohibits conduct by one who

> "knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in *fact involves the proceeds of specified unlawful activity* . . . with the intent to promote the carrying on of specified unlawful activity . . . or *knowing that the transaction is designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds* of specified unlawful activity . . . ."

18 U.S.C. §§ 1956(a)(1)(A)(i), (B)(i) (emphasis added).

The district court instructed the jury that to find Rubashkin guilty of money laundering it would need to find: (1) that he "conducted a financial transaction" consisting of the deposit of checks from the grocery store and school into the account

-21-

used to repay the loan with the Bank; (2) that the financial transaction "involved the proceeds of specified unlawful activity, that is, bank fraud, making false statements and reports to a bank, wire fraud or mail fraud"; (3) "at the time [he] conducted the financial transaction, [he] knew the money represented the proceeds of some form of unlawful activity"; and (4) "[he] conducted the financial transaction knowing that the transaction was designed in whole or in part to conceal or disguise the nature, location, source, ownership or control of the proceeds of the specified unlawful activity."

At the time of the conduct giving rise to Rubashkin's charges, the term proceeds was not defined in the money laundering statute.[3]  In defining this term, the district court instructed the jury that

> "proceeds" means any property . . . that someone acquires or retains as a result of the commission of a specified unlawful activity. . . . *If someone commits a fraud scheme and thereby acquires money from the victim of the fraud, that money is the proceeds of the crime.*  The term "proceeds" includes, but is not limited to, profits.  *"Profits" consist of what remains after expenses are paid.*

(emphasis added).

Rubashkin contends that the district court improperly instructed the jury that "proceeds" do not have to be "profits" of a "specified unlawful activity."  The jury was instructed to answer special verdicts asking "whether the [money laundering] offense[s] involved profits from a specified unlawful activity" (emphasis in original).  For each of the money laundering counts, the jury unanimously found that

---

[3]For conduct occurring after May 20, 2009 Congress has defined the term "proceeds" to mean "any property derived from or obtained or retained, directly or indirectly, through some form of unlawful activity, including the gross receipts of such activity."  18 U.S.C. § 1956(c)(9).

-22-

Rubashkin's conduct "did not involve profits obtained from the commission of a specified unlawful activity" (emphasis in original).

In his argument on appeal, Rubashkin bases his claim that the statutory term "proceeds" must be profits on the Supreme Court's decision in United States v. Santos, 553 U.S. 507 (2008). The defendant in Santos had operated an illegal lottery and used part of the collected funds to pay lottery winners and employees. Id. at 509. Those payments were the basis for his money laundering convictions. Id. at 509–10. Since the transactions involved paying the costs of running the illegal lottery, they involved the lottery's gross receipts but not its profits. The controlling concurrence, which created a majority, explained that it could be unfair to "[a]llow[] the Government to treat the mere payment of the expense [of committing an offense] as a separate offense," Id. at 527. Such punishment would be "in practical effect tantamount to double jeopardy," id., since the unlawful activity that produced the proceeds "would 'merge' with money laundering." Id. at 516 (plurality opinion).

Rubashkin argues that the merger problem mentioned in Santos exists in this case because the transactions supporting his money laundering convictions were a necessary part of his underlying fraud. The government contends that Santos has a very narrow application, that "proceeds" means "profits" only in illegal gambling cases, and that there is no merger problem in this case.

The government's argument limiting Santos to illegal gambling cases is supported by a footnote in United States v. Spencer, 592 F.3d 866, 879 n.4 (8th Cir. 2010). That footnote read alone implies that Santos only applies to illegal gambling cases, but read in the context of the opinion it merely indicated that Santos "does not apply in the drug context." Id. at 879-80. Spencer involved drug trafficking, a type of activity which the controlling opinion in Santos stated was always separately punishable from money laundering. Santos, 553 U.S. at 525-26. Moreover, the laundered proceeds in Spencer were clearly profits. Spencer, 592 F.3d at 880.

When there is no majority opinion in a Supreme Court case, "'the holding of the court may be viewed as that position taken by those Members who concurred in the judgment on the narrowest grounds.'" SOB, Inc. v. Cnty. of Benton, 317 F.3d 856, 862 n.1 (8th Cir. 2003) (quoting Marks v. United States, 430 U.S. 188, 193 (1977)). The narrowest holding in Santos was Justice Stevens's concurrence stating that "proceeds" must mean "profits" whenever a broader definition would "perverse[ly]" result in a "merger problem." 553 U.S. at 527, 528 n.7. It follows that the government's argument that proceeds only means profits in the illegal gambling context can therefore not be correct. We therefore consider more fully Rubashkin's argument that Santos forecloses his money laundering convictions.

Rubashkin compares his actions to those in two other appellate cases decided after Santos. Garland v. Roy, 615 F.3d 391 (5th Cir. 2010); United States v. Van Alstyne, 584 F.3d 803 (9th Cir. 2009). Garland involved a pyramid schemer's payments to early investors to keep his fraud going. On collateral review, the Fifth Circuit indicated that those payments had possibly merged with the underlying mail and securities fraud charges because the same transactions gave rise to both the underlying fraud charges and those for money laundering. 615 F.3d at 400, 404. Van Alstyne arose out of a Ponzi scheme in which later investors were victims of fraud. 584 F.3d at 807-08. On direct appeal the Ninth Circuit concluded that since the defendant's payments to early investors were necessary to carry out the frauds, they were not separately punishable as money laundering. Id. at 815. Rubashkin argues that like the defendants in Garland and Van Alstyne, who used payments from later investors to pay earlier investors, he used the proceeds of later loans from the Bank to pay down Agriprocessors' earlier loans, allowing him to divert customer payments and inflate Agriprocessors' accounts receivable.

What makes his case distinguishable from these two cases is that the money laundering charges here were not predicated solely on Rubashkin's bank fraud charges, but also on charges of making false statements and reports to a bank in

-24-

violation of 18 U.S.C. § 1014. Moreover, the bank fraud charged under 18 U.S.C. § 1344 was based on three theories: (1) diverting customer payments to inflate accounts receivable; (2) creating false invoices to increase accounts receivable; (3) and making false statements regarding compliance with immigration laws and the Packers Act.

In this case, the jury returned special verdicts indicating that its guilty verdict for the ten money laundering charges was based on its findings that Rubashkin had also committed specific acts of bank fraud and made specific false statements to the bank. For each count of money laundering, the jury had been asked:

> If you found the defendant, Sholom Rubashkin, guilty of [a money laundering count], place a check mark (✓) below next to the specified unlawful activity or activities involved in the commission of that offense:
> _____ bank fraud
> _____ making false statements and reports to a bank
> _____ wire fraud
> _____ mail fraud

The jury checked the lines next to bank fraud and making false statements and reports to a bank for every one of the money laundering charges. We can therefore be certain that not only was making false statements to a bank a theory on which the government based its money laundering charges, but it was a theory for which the jury convicted him on each of those charges.

There is no merger problem here because making false statements to a bank is a distinct offense compared to money laundering. Unlike the illegal gambling operation in Santos or the pyramid and Ponzi schemes addressed in Garland and Van Alstyne, the crime of making false statements to a bank is separate from Rubashkin's money laundering activity. The predicate offense was completed every time Rubashkin made a false statement and received a loan disbursement from the Bank.

-25-

The Ninth Circuit differentiated between money laundering premised on schemes involving false attestations of compliance with the law and those requiring subsequent payments, like Ponzi schemes. Van Alstyne, 584 F.3d at 815.

In a case with some legal similarity to Rubashkin's, United States v. Kasprowicz, No. 10-30334, 2011 WL 3586111 (9th Cir. Aug. 16, 2011) (unpublished decision), the defendant was charged with making false statements to a bank in order to get a loan and with money laundering arising out of his subsequent transfer of the loan proceeds from one account to another. Kasprowicz argued that under Van Alstyne his offenses merged, but the Ninth Circuit concluded that there was no merger because false statements to banks "do not require a separate transfer of funds even if the false statements are made to obtain a loan." Id. at *1. Like the transfer of fraudulent loan proceeds from one account to another in Kasprowicz, Rubashkin's transfer of fraudulent loan proceeds to the grocery store and school was not a necessary result of his obtaining loans through false statements. Rather, the payments from the school and grocery store were done "in whole or in part to conceal or disguise the nature, the location, [or] the source . . . of the proceeds of specified unlawful activity." 18 U.S.C. § 1956(a)(1)(B)(i).

By sending the fraudulent loan proceeds through the grocery store and school and then on to pay down the loan, Rubashkin made the payments appear to be something they were not, i.e. legitimate customer payments. He thereby participated in a classic money laundering transaction. The government proved a separate offense, making false statements to a bank, which did not merge with the money laundering but was a predicate offense on which the money laundering charges were based.

Moreover, the bank fraud charged here differs from schemes where merger has been found because the specific fraud did not require the types of payments which gave rise to the money laundering charges. The bank fraud charges included false

statements regarding compliance with the Packers Act and the immigration laws, as well as falsely inflating the amount of Agriprocessors' accounts receivable available as collateral for the revolving loan. In addition to inflating the accounts receivable to enable Agriprocessors to borrow larger amounts than it could have in the absence of such collateral, Rubashkin needed to pay down the loan periodically to continue to receive additional funds from the Bank. One of the mechanisms he developed for getting more funds was unique in that he hid Agriprocessers' customer payments by funneling money through the grocery store and school to repay the loan. This mechanism was not essential to his overall scheme in the same way as payments to runners in illegal gambling schemes or payments to early investors in pyramid schemes.

Rubashkin could, for example, have had Agriprocessors make payments directly from its own accounts to repay the loan while still creating false invoices and diverting customer payments to inflate the accounts receivable amounts. Instead, he chose to repay the bank by first making payments to third parties and then having those third parties make false customer payments to pay down the loan. This added the additional step of "disguising the nature, the location, [or] the source . . . of the proceeds of specified unlawful activity," id., and is thus separately punishable as money laundering.

Rubashkin further argues that his money laundering convictions should be vacated because the money laundering transactions were not done to promote or conceal his underlying unlawful activities as required by 18 U.S.C. § 1956. This argument ignores the fact that by running the fraudulent loan proceeds through the grocery store and school, and subsequently having those entities write checks to Agriprocessors in odd amounts so that they would appear to the Bank as customer payments, Rubashkin took steps to conceal the proceeds of his earlier false statements to the bank. Therefore he cannot prevail on this claim. See United States v.

Phythian, 529 F.3d 807, 813-14 (8th Cir. 2008) (discussing requirements for concealing the proceeds of unlawful activity).

We conclude that Rubashkin's money laundering convictions were lawful and did not merge with any other of his crimes.

VI.

A.

Rubashkin argues that at sentencing the district court miscalculated the loss involved in his fraud. A district court considers the greater of the actual or intended loss caused by a fraud, U.S.S.G. § 2B1.1 cmt. n.3(A). The parties agree that actual loss is the relevant calculation here. Actual loss is "the reasonably foreseeable pecuniary harm that resulted from the offense." Id. § 2B1.1 cmt. n.3(A)(i). We review a district court's interpretation and application of the sentencing guidelines de novo and its findings of fact for clear error. United States v. Miller, 588 F.3d 560, 567 (8th Cir. 2009).

The district court calculated the loss amount as the unpaid balance on the Agriprocessors loan minus the bank's recovery in bankruptcy proceedings. That amounted to about $27 million. Rubashkin contends that the correct figure would be $12 million—the difference between what the bank would have lent Agriprocessors without inflated collateral and what it actually lent. His calculation fails to account for an additional $15 million the bank lost due to Agriprocessors' insolvency and related bankruptcy.

The formula Rubashkin proposes applies to calculations of intended loss under the sentencing guidelines. Miller, 588 F.3d at 566. We have never extended that formula to determine actual loss. See U.S.S.G. §§ 2B1.1 cmt. n.3(A)(i)–(ii) (defining

-28-

actual and intended loss). The government suggests that the more relevant guideline is U.S.S.G. § 2B1.1 cmt. n.3(E)(ii). The commentary to that guideline provides that in cases involving pledged collateral (such as in a bank fraud), loss shall be reduced by "the amount the victim has recovered at the time of sentencing from disposition of the collateral, or if the collateral has not been disposed of by that time, the fair market value of the collateral at the time of sentencing."

The relevant guideline commentary and the weight of authority interpreting it are contrary to Rubashkin's argument. The purpose of collateral is to protect a lender in the event of a borrower's default. See Black's Law Dictionary 278 (8th ed. 1999). The relevant guideline commentary provides that our first consideration should be how much protection the collateral actually provided. U.S.S.G. § 2B1.1 cmt. n.3(E)(ii). If a district court were to find that the outstanding debt less the collateral would overstate the loss that foreseeably resulted from fraud, it could depart downward.

Other circuit courts considering this issue have concluded that loss is simply the unpaid balance on a fraudulently obtained loan, less the realized or fair market value of any pledged collateral. See, e.g., United States v. Turk, 626 F.3d 743, 750 (2d Cir. 2010) ("[A] defendant may not reasonably count on the expected sale value of collateral to save himself from the foreseeable consequences of his fraudulent conduct"); United States v. Serfling, 504 F.3d 672, 679 (7th Cir. 2007).

Rubashkin argues that changed market conditions, unreasonable negotiating by the Bank, and mismanagement by the bankruptcy trustee combined to cause the default on otherwise secured loans. The district court considered this argument before making the specific factual finding that all $27 million of the default foreseeably resulted from Rubashkin's actions. It rejected Rubashkin's argument as "fail[ing] to consider the impact of a massive fraudulent scheme on the value of a company." We agree. Any reasonable person could have foreseen that large scale

-29-

fraud could lead to collapse and insolvency if discovered. We see no error in the district court's loss calculation.

B.

Rubashkin argues that the district court failed to consider all of the sentencing factors under 18 U.S.C. § 3553(a). He contends that he acted from pure motives—maintaining the family business and producing kosher food—and that the district court erroneously believed that motive should not be considered. There is no basis in the record for that contention. The district court simply chose not to "vary downward <u>in this case</u>" based on motive (emphasis added). The district court acknowledged Rubashkin's family commitments and charity, but it observed that "[i]t is far easier to be generous with someone else's money instead of one's own" and that Rubashkin's disabled son would receive care in his absence from his "loving and competent mother" and "supportive extended family," support not available in many of the cases before it. It chose not to vary downward on these bases.

Next Rubashkin argues that his sentence creates unwarranted disparities with similarly situated defendants. He points to data showing that fraud defendants with loss amounts in the $20–50 million range receive 145 month sentences on average. These figures do not show the degree of variation around that average, and district courts are certainly not required to impose an average sentence in every case. Such a requirement would cut directly against their broad sentencing discretion. <u>See</u> <u>Gall v. United States</u>, 552 U.S. 38 (2007); <u>United States v. Booker</u>, 543. U.S. 220 (2005). Nor does the sentencing information advanced by Rubashkin at all suggest that the district court in this case failed to consider § 3553(a).

District courts are not required "to provide a mechanical recitation of the § 3553(a) factors when determining a sentence." <u>United States v. Walking Eagle</u>, 553 F.3d 654, 659 (8th Cir. 2009). Rather, district courts are to consider the factors laid

out in the statute and the evidence in fashioning an appropriate sentence. Id. Here, the district court explicitly discussed each possible basis for departure, disproving Rubashkin's contention that it overlooked them. We find no error in the district court's § 3553(a) analysis.

Finally, Rubashkin argues that his 324 month sentence was substantively unreasonable given his age, nonviolence, lack of criminal history, unlikelihood of recidivism, family obligations, and the principal motives for his acts,. We review the imposition of a sentence under "a deferential abuse-of-discretion standard." United States v. Hayes, 518 F.3d 989, 995 (8th Cir. 2008) (quoting Gall, 552 U.S. at 41). Sentences within the guideline range are presumed to be substantively reasonable. United States v. Robinson, 516 F.3d 716, 717 (8th Cir. 2008).

Not only was Rubashkin's sentence of 324 months within the guideline range, it was at the low end of it. Rubashkin argues that because of his past charitable acts and his family obligations he should have been granted a downward departure. These are the very characteristics that the district court properly took into account when considering the § 3353(a) factors. The court weighed Rubashkin's past charitable acts, nonviolence, and the needs of his family against his involvement in multiple fraudulent schemes and the millions of dollars in damage they caused. The cases Rubashkin cites in favor of his unreasonableness argument illustrate instances where downward departures based on charity or family needs have been affirmed. Nothing requires a sentencing court to depart on such grounds. Under all the circumstances the district court did not abuse its considerable discretion in imposing a 324 month sentence.

## VII.

We affirm the order of the district court denying a new trial as well as its judgment.

_____